CARLOS TORMOS ARROYO y OTROS, demandantes y recurrentes, *v.* DEPARTAMENTO DE INSTRUCCIÓN PÚBLICA DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS, demandados y recurridos.

*Número:* RE-94-335          *Resuelto:* 13 de marzo de 1996

*Enrique J. Mendoza Méndez*, abogado de la parte recurrente; *Wanda I. Rodríguez Rodríguez*, abogada de la parte recurrida.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

I

Carlos Tormos Arroyo y su esposa Clara L. Mercado Rivera —por sí y como padres del menor Nathaniel Tormos Mercado— presentaron en el Tribunal Superior, Sala de San Juan, una acción de daños y perjuicios contra el Estado Libre Asociado (Departamento de Educación), el menor David López González, sus padres y la sociedad legal de gananciales, reclamándoles resarcimiento por los daños sufridos como resultado de una golpiza ocurrida a Nathaniel el 30 de noviembre de 1989.

El Estado negó responsabilidad. Entre otras defensas adujo que los jóvenes que atacaron y golpearon a Nathaniel no eran estudiantes de la Escuela Intermedia William D. Boyce y que al ocurrir el incidente todos se encontraban *fuera* de los predios escolares.

Luego de varios trámites comenzó el desfile de prueba. Oportunamente, a solicitud de los demandados, el ilustrado foro de instancia (Hon. Jeannette Tomasini Gómez, Juez) desestimó. Regla 39.2(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III. Concluyó que Nathaniel salió de la escuela a almorzar en su casa situada cerca, a un solo bloque, acompañado de su hermano Jonathan, su novia Anibel Mondesi Padilla y el hermano de ésta, Aníbal. Salieron por el portón de atrás que estaba abierto —para que los estudiantes pudieran ir a almorzar— y que da a una calle de residencias privadas en la urbanización Las Lomas.

Cuando regresaban y se encontraban *cerca* del portón, se aproximó un grupo de cinco (5) a seis (6) jóvenes. Ellos se percataron de esos jóvenes como a una distancia de veinticinco (25) pies; el grupo atacante venía por el lado contrario a la calle de donde caminaban. Todos apresuraron el paso —presentían que algo iba a pasar— y entraron a la escuela sin detenerse. Sin embargo, Nathaniel fue rodeado por el grupo y uno de los jóvenes lo agredió con los

puños. El incidente se produjo tan rápido que ni Nathaniel ni sus testigos pudieron identificar a ninguno de los jóvenes, aunque pudieron describirlos.

Simultáneamente, como era la 1:00 P.M. —hora de almuerzo y entrada a clase— dentro del plantel (balcones y patio), los estudiantes y empleados no se dieron cuenta de lo ocurrido hasta que Nathaniel estaba siendo agredido.

Luego de la golpiza, Nathaniel entró a la escuela y fue llevado a la Oficina de la Directora quien llamó a sus padres. Nathaniel tenía la nariz hinchada y sangraba; le pusieron hielo. Sus padres lo llevaron a recibir asistencia médica y presentaron una querella en la Policía. Nathaniel sufrió una fractura de huesos y tabique nasales. Finalmente, terminó su semestre y cambió de escuela para proseguir estudios superiores, ya que la Escuela William D. Boyce era sólo hasta grados intermedios.

Según indicado, a base de los hechos antes descritos, el tribunal de instancia concluyó que a tenor con el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, no se había probado ninguna relación causal entre los daños sufridos por los demandantes Tormos Arroyo *et al.* y la acción u omisión de los demandados.([1]) Expedimos.

---

([1]) Argumentan la comisión de los errores siguientes:

"1[.] *Erró el Tribunal de instancia al determinar que el Departamento de Instrucción no responde civilmente en este caso.*

"2. *Erró el Tribunal de instancia al resolver que la falta de un Comité de Seguridad en la Escuela William D. Boyce no tuvo relación causal con la agresión de que Nathaniel fue objeto.*

"3. *Erró el Tribunal de instancia al resolver que la falta de un Comité de Seguridad en la Escuela William D. Boyce era el único supuesto en que predicaba la teoría de responsabilidad de la parte demandante.*

"4. *Erró el Tribunal de instancia al no encontrar responsable al Departamento de Instrucción ante las admisiones contra intereses de la propia Directora Escolar.*

"5. *Erró el Tribunal de instancia al no encontrar responsable civilmente al Departamento de Instrucción ante las omisiones de la Directora Escolar de no tomar acción afirmativa ante una situación previsible de peligro para su estudiantado.*"
(Énfasis en el original.) Recurso de revisión, págs. 4–5.

## II

Por estar relacionados, los recurrentes Tormos Arroyo *et al.* discuten los errores conjuntamente; los examinaremos de igual forma.

La teoría de los demandantes Tormos Arroyo *et al.*, en síntesis, es que bajo la Ley Núm. 26 de 5 de junio de 1985 (18 L.P.R.A. sec. 141 *et seq.*), el Departamento de Instrucción tiene la *obligación* de proveer protección y seguridad a los estudiantes que asisten a las escuelas públicas del país, y que en la medida en que tuvo lugar la agresión de Nathaniel es civilmente responsable, pues incumplió el deber legal de velar y proteger la salud y el bienestar de sus estudiantes *al no tener un cuerpo de seguridad según lo requiere dicho estatuto.*

Invocan también la Ley Núm. 40 de 5 de junio de 1986, según enmendada, 24 L.P.R.A. sec. 2411a, que provee protección a los estudiantes contra comerciantes de drogas en los alrededores de la escuela.

Además, aluden y caracterizan como "admisiones contra interés" las expresiones de la Directora Escolar, Sra. Noemí Mojica,[2] de las cuales infieren especial obligación de evitar cualquier daño *dentro y fuera del plantel.*

Luego de evaluar detenidamente todos los hechos particulares de este caso, resolvemos que les asiste la razón; procede revocar. Nos explicamos.

■ La Ley Núm. 26, *supra,* sobre el Cuerpo de Seguridad Escolar, fue producto de una preocupación genuina por el creciente aumento de criminalidad y sucesos de violencia en los planteles escolares. Ordena al Secretario de Educación crear un cuerpo de orden público para la protección de estudiantes, maestros, empleados y propiedad escolar en los planteles escolares y sus alrededores, y desarrollar un sistema que garantice la prevención y no comisión de

---

[2] Producto de una deposición presentada como evidencia.

actos delictivos dentro y en los alrededores de la escuela. Se concederá prioridad al asignar los servicios del Cuerpo de Seguridad Escolar a aquellos planteles escolares con mayores problemas de vandalismo e incidencia criminal. La Ley Núm. 26, *supra*, confiere jurisdicción a dicho comité hasta una distancia de doscientos (200) metros que ha de contarse desde el punto más cercano al lindero exterior del predio ocupado por la escuela.

■ De entrada, no cabe interpretar que en virtud de la Ley Núm. 26, *supra*, el Estado es garantizador absoluto de la seguridad del estudiantado o facultad en todo momento y lugar. Como fuente generadora de responsabilidad, el deber dimanante de la Ley Núm. 26, *supra*, no puede divorciarse del Art. 1802 del Código Civil, *supra*.([3]) Sucintamente, a su amparo, para imponer responsabilidad *es necesario que coexistan tres (3) factores: (1) acto negligente o culposo; (2) daños, y (3) nexo causal entre el daño y la acción u omisión de otra persona. Cotto v. C.M. Ins. Co.*, 116 D.P.R. 644 (1985). Por otra parte, los elementos que han de considerarse en la determinación de si una *omisión* genera responsabilidad son: (1) *la existencia* o inexistencia de *un deber* jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual constituye la antijuridicidad, y (2) *si de haberse realizado el acto omitido se hubiera evitado el daño. Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94 (1986).

## III

■ Cuando hablamos de planteles escolares y sus alrededores, el estándar de cuidado exigible, si bien no es absoluto, es más riguroso. Como dijimos en *Cruz Costales v. E.L.A.*, 89 D.P.R. 105, 111–112 (1963), "[l]os códigos, la ju-

---

([3]) Dispone que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". 31 L.P.R.A. sec. 5141.

risprudencia y los autores proporcionan ciertas reglas razonables y útiles para la solución de los casos, pero es éste un campo en donde el derecho no puede ser fijo y estático y los tribunales tienen que resolver cada caso de acuerdo con sus circunstancias particulares".

■ Reiteramos que el Estado no es garantizador absoluto del bienestar público. No lo podría ser, pues conocidas son sus limitaciones económicas y humanas. *Ortiz Torres v. K & A Developers, Inc.*, 136 D.P.R. 192 (1994). Ahora bien, "adelantamos que existen ciertos tipos de actividades, tales como las llevadas a cabo por las escuelas, que por su naturaleza esencial, vienen 'obligad[as] a ofrecer un grado de protección y seguridad independiente del que puedan proveer las agencias de seguridad pública". *Estremera v. Inmobiliaria Rac, Inc.*, 109 D.P.R. 852, 856 (1980). " 'Es el incumplimiento con este deber, unido al hecho de que el daño sea previsible y su incumplimiento la causa adecuada, lo que responsabiliza a la institución. El grado de seguridad que viene obligada a ofrecer una institución educativa depende de la naturaleza de la institución, de su localización y de la manera en que funciona y ofrece sus servicios. *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294, 314 (1990).' " *Santiago Vázquez v. E.L.A.*, 138 D.P.R. 10, 14 (1995), opinión concurrente. Véase, además, *Estremera v. Inmobiliaria Rac, Inc.*, supra, pág. 856.

■ Tan consciente de esa realidad está el legislador que aprobó la citada Ley Núm. 26 —para crear un cuerpo de seguridad escolar— teniendo en cuenta problemas de criminalidad y vandalismo, tanto en los planteles escolares como en los alrededores. Precisamente para atajar esos serios problemas, dispuso que el Secretario de dicho cuerpo tendría, entre sus deberes y facultades, que:

(a) Proteger la vida y propiedad de la comunidad escolar.
(b) *Ejercer vigilancia y proteger la seguridad y el orden público en los planteles escolares y sus alrededores.*
(c) *Desarrollar un sistema que garantice la prevención y la no*

*comisión de actos delictivos dentro y en los alrededores de los*
*planteles escolares mediante el cual se concederá prioridad al*
*asignar los servicios del Cuerpo a aquellos planteles escolares*
*con mayores problemas de vandalismo e incidencia criminal.*
(d) Velar por el cumplimiento de todas las leyes del Estado
Libre Asociado de Puerto Rico referentes a la protección de la
vida y la propiedad en los planteles escolares de Puerto Rico y
sus alrededores. (Énfasis suplido.) Art. 6 de la Ley Núm. 26,
*supra*, 18 L.P.R.A. sec. 141d.

Acto seguido, en el inciso (e) de la misma sección, se
conceden prerrogativas y deberes tales como informar so-
bre violaciones en lo concerniente a expedir licencias para
detallar bebidas alcohólicas en establecimientos comercia-
les; hacer cumplir ciertas disposiciones contenidas en la
Ley de Vehículos y Tránsito de Puerto Rico; velar porque se
obedezca la prohibición de sustancias controladas en los
planteles; vigilar para evitar la comisión del delito de es-
calamiento agravado y el consistente en entrar o permane-
cer sin permiso en terrenos y edificios escolares; informar
sobre violaciones a la ley que reglamenta la distancia entre
las escuelas y los establecimientos de máquinas electróni-
cas, y poner en vigor y hacer cumplir leyes, reglamentos y
normas del Departamento de Educación. Con el propósito
de poder llevar a cabo y viabilizar esos poderes encomen-
dados, se le reconoce al Cuerpo de Seguridad Escolar facul-
tades para realizar arrestos; emitir citaciones por violacio-
nes a leyes administrativas; ejecutar órdenes de arresto y
registro emitidas por los tribunales; obtener y ejecutar ór-
denes de allanamiento; llevar a cabo confiscaciones e in-
cautaciones —conforme a la ley— de materiales como sus-
tancias controladas, armas, vehículos de motor o arrastre,
bebidas alcohólicas, etc.

Al remitirnos al Art. 11 de la Ley Núm. 26 de la Ley
Núm. 26, *supra*, 18 L.P.R.A. sec. 141i, vemos que se enco-
mienda al Secretario de Educación efectuar las gestiones
para que los miembros del Cuerpo de Seguridad Escolar
sean adiestrados por la Academia de la Policía de Puerto
Rico. Por su parte, el Art. 13 de la citada ley, 18 L.P.R.A.

sec. 141k, dispone que las reglas y los reglamentos que se adopten a tenor con la ley "deberán incluir el requisito de someterse a un adiestramiento durante un período no menor de tres (3) meses en la Academia de la Policía el cual formará parte de su período probatorio".

## IV

Con vista a este ordenamiento, el reducto final de nuestro análisis puede sintetizarse en estas interrogantes: ¿resultaba previsible el acto dañoso (golpiza)? ¿Pudo evitarse de haberse realizado el acto omitido? Esto es, ¿hubo relación de causalidad entre la omisión y el acto dañoso?

Cabe señalar que "[e]l deber de cuidado incluye tanto la obligación de anticipar como la de evitar la ocurrencia de daños cuya probabilidad es razonablemente previsible". *Elba A.B.M. v. U.P.R.*, supra, pág. 309. De otro lado, " '[l]a culpa consiste en la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el resultado dañoso.' C. Rogel Vide, *La Responsabilidad Civil Extracontractual*, Ed. Civitas, 1976, pág. 90. La diligencia exigible es la que cabe esperar del ser humano medio, el buen *paterfamilias*. Si el daño es previsible por éste hay responsabilidad. Si no es previsible estamos generalmente en presencia de un caso fortuito. Rogel Vide, *op. cit.*, pág. 91". *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700, 704 (1982).

Finalmente, no basta que concurran un daño y una acción u omisión negligente. Para generar responsabilidad es imperativo un nexo causal entre el daño y el acto culposo o negligente. *Rodríguez v. Colón Colón*, 103 D.P.R. 493, 499–501 (1975); *Negrón v. Orozco Rivera*, 113 D.P.R. 712 (1983); *Hernández v. E.L.A.*, 116 D.P.R. 293 (1985).

Al respecto, el Estado expone:

Ahora bien, ¿de haberse llamado la Policía o de haber exis-

tido el Cuerpo de Seguridad Escolar se hubiese evitado la agresión? Sostenemos que no. Como bien señaló el Honorable Tribunal sentenciador a la página 3 de su Sentencia: "..., por la forma en que ocurrió el mismo y con la rapidez y celeridad con que ocurrió, entendemos que estos hechos fueron súbitos e imposibles de prever. Como cuestión de hecho, el co-demandante no iba solo, ni su hermano, ni su novia, ni el hermano de ésta se detuvieron, ni lo ayudaron, ni buscaron ayuda para él."

"Una persona no está obligada a prever todos los posibles riesgos que puedan concebirse en una determinada situación, pues prácticamente se convertiría en una responsabilidad absoluta", ya que "el deber de previsión no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad, sino aquél que llevaría a una persona prudente a anticiparlo." *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8 (1987); *Pacheco v. AFF*, 112 D.P.R. 296 (1982).

Entendemos, muy respetuosamente, que desde el punto de vista del derecho, y en las circunstancias que presenta el caso que nos ocupa, lo acaecido no era anticipable. No era razonable anticipar que la presencia de un grupo de personas caminando por una carretera cercana a una escuela iba a culminar en la agresión de uno de sus estudiantes. Alegato en cumplimiento de orden, págs. 11–12.

No nos convence. No estamos ante un hecho *fortuito* o un riesgo *tan remoto* que no pudiera ser previsto por una persona prudente. No se trata de un accidente o sorpresa. Tampoco de una situación imprevisible de unas personas caminando por la acera, que inexplicablemente atacan a un estudiante.

El cuadro fáctico ante nos encaja precisamente en la previsión legislativa *general* y su consiguiente provisión —avalada por la crítica situación de criminalidad y vandalismo existente en nuestro país— de la cual no están exentos los planteles escolares e inmediaciones. Así se expresa en la exposición de motivos y declaración de política pública del estatuto que crea el Cuerpo de Seguridad Escolar.

No podemos acoger la visión tan limitada de previsibilidad que propugna el Estado. Como dijimos en *Ginés Meléndez v. Autoridad*, 86 D.P.R. 518, 523–525 (1962), reafirmado en *Cruz Costales v. E.L.A.*, supra:

Claro está, tendríamos que exonerar de responsabilidad a la demandada si aceptamos su argumento de que a ella "Le era imposible preveer la condición peligrosa en la cual se encontró la parte demandante". Pero la regla de anticipar el riesgo no se limita a que el riesgo preciso o las consecuencias exactas arrostradas debieron ser previstas. Lo esencial es que se tenga el deber de prever en forma general consecuencias de determinada clase. No es defensa alegar que no se pudo prever el curso preciso o toda la extensión de las consecuencias, siendo de esa clase, que como cuestión de hecho, ocurrieron. 2 Harper and James, *The Law of Torts*, pág. 1147.

.     .     .     .     .     .     .     .     .

Se ha sostenido además que la responsabilidad no depende de si en el ejercicio de razonable diligencia, el demandado previó o debió prever, el daño específico reclamado, pero la parte acusada de negligente puede ser responsable de cualquier cosa que después de completado el daño, aparezca ser una consecuencia natural y probable de su acto u omisión. Es por tanto innecesario que el demandante haya anticipado el daño específico imputádole o que haya anticipado que dicho daño iba a ocurrir en la forma precisa que ocurrió.

**Distinto a lo señalado por el tribunal sentenciador, no estamos ante unos hechos súbitos e imposibles de prever.([4])**

---

([4]) De hecho, y aunque no se pudo establecer la identidad de los jóvenes que agredieron a Nathaniel, coincidentalmente ese mismo día la Directora señora Mojica observó a un grupo de jóvenes merodeando, según surge de su deposición:

"P Le pregunto si este día usted vio al grupo de jóvenes que agrede al joven Nathaniel, si usted los vio.

"R No, señor.

"P No los vio.

"R *Bueno, sí.* Perdone. Yo vi un grupo de personas extrañas detrás de ... en la carretera que da a la *parte de atrás de mi oficina.*

"P O sea, ¿frente al portón de la parte de atrás?

"R Sí. Cerca de los portones de la escuela. *Anteriormente los había visto por allí merodeando, pero eso es muy usual que ocurra.*

"P ¿Que merodeen?

"R Sí.

"P ¿Grupos así?

"R Sí, sí." (Énfasis suplido.) Apéndice, pág. 000041.

No obstante percatarse de que personas extrañas merodeaban, *nada hizo.* Ante tal desidia de la administración, avalamos el siguiente análisis de los recurrentes:

"¿Qué hubiera costado el meramente pararse en el portón a velar los estudiantes que entraban? ¿El enviar a un empleado escolar a ello? ¿Llamar a la Policía para que se diera una vuelta? ¿Preguntarle a las 'personas extrañas' si se les podía ayudar en algo? Sencillamente, no se hizo nada.

Entre sus determinaciones de hecho, surgen varios de los factores que abonan la conclusión de que pudo preverse y evitar el incidente, de haber existido en la escuela un cuerpo de seguridad escolar.

3) Todos ellos salieron por el portón que está en la parte de atrás de la escuela, *el cual es abierto para que los estudiantes vayan a almorzar*, y el cual da a una calle en la cual, además de la escuela, hay casas privadas de la misma urbanización. Regresaron por esa misma calle y portón.

4) Cuando el co-demandante y sus acompañante[s] regresaban y se acercaban al portón de la escuela, se les aproximó un grupo de 5 [a] 6 jóvenes; *todos los acompañantes de Nathaniel apresuraron el paso pues presentían [que] algo iba a pasar*, y entraron a la escuela sin detenerse. Esto fue alrededor de la 1:00 P.M.

5) Nathaniel fue detenido por el grupo —de hecho, su novia oyó cuando se dirigieron a él.

6) El grupo rodeó a Nathaniel y uno de los jóvenes lo agredió, con los puños. Todo se produjo rápidamente.

7) Ni Nathaniel ni sus testigos pudieron, identificar a ninguno de los jóvenes, aunque sabían describirlos. *Se percataron de esos jóvenes como a una distancia de 25 pies de ellos, viniendo el grupo atacante del lado contrario de la calle de donde procedía el co-demandante.*

8) *Como era hora de almuerzo y entrada a clase*, dentro de la escuela habían [sic] varios estudiantes y empleados por los balcones y patio, pero todos se dieron cuenta de lo ocurrido cuando Nathaniel entró a la escuela o cuando ya estaba siendo agredido. (Énfasis suplido.) Apéndice, pág. 000094.

De esta relación fáctica se desprende que los estudiantes contaban con permiso para salir a almorzar fuera de la escuela, para lo cual existía un portón abierto; que los acompañantes de Nathaniel anticiparon que algo iba a

---

"Un padre de familia prudente y razonable ve un grupo de personas extrañas merodeando cerca del portón de su residencia y algo hace. Repetimos no estamos hablando de registrar o arrestar a las personas, pero algo puede hacerse. Lo que está en juego es la salud, seguridad y hasta la vida de los estudiantes.

"Por tanto, independientemente de la existencia o no de un Comité de Seguridad, la Directora Escolar tuvo ante sí los elementos para tomar una acción profiláctica ante un grupo de personas extrañas merodeando el portón de su plantel y nada hizo." Alegato de la parte recurrente, pág. 13.

ocurrir y apresuraron el paso; que vieron a los atacantes como a veinticinco (25) pies de ellos, del lado contrario de la calle por donde discurrían, y que la agresión ocurrió a la hora de entrada a clase por almuerzo.

No albergamos duda de que de haber existido un cuerpo de seguridad escolar se pudo haber anticipado la agresión. El incidente ocurrió en los alrededores del plantel, esto es, dentro del área de doscientos (200) metros desde el punto más cercano al lindero exterior del predio donde está la escuela; al ser la hora de entrada de regreso al almuerzo —y contando los estudiantes con permiso para salir a almorzar— era previsible que varios estudiantes estuvieran en los alrededores del plantel, *imponiéndose un requisito de mayor vigilancia en esos momentos*. Al igual que lo hicieron los acompañantes de Nathaniel, un cuerpo de seguridad escolar pudo haber anticipado alguna confrontación de parte de cinco (5) o seis (6) extraños. Recordemos que dicho cuerpo, conforme dicta la Ley Núm. 26, *supra*, debe recibir adiestramiento en la Academia de la Policía de Puerto Rico y, según exige el inciso (b) del citado Art. 6, les corresponde "[e]*jercer vigilancia y proteger la seguridad y el orden público en los planteles escolares y sus alrededores*". (Énfasis suplido.) 18 L.P.R.A. sec. 141d(b).

No debemos perder de perspectiva que estamos ante un deber de previsibilidad general a priori que hizo la Asamblea Legislativa consciente de la probabilidad de actos delictivos en planteles escolares y sus alrededores; resultado de una realidad reiterada y persistente. De lo contrario, no se hubiera creado un cuerpo semipolicial con las amplias prerrogativas que le concede la ley, destinándose fondos públicos para su implantación.

La presencia de un cuerpo semipolicial en dicho plantel hubiera cambiado la situación, no sólo por la posibilidad de una pronta y oportuna intervención o participación activa al percatarse de la situación de peligro potencial, *sino como factor disuasivo dimanante del conocimiento de la ciuda-*

*danía de su existencia.* Este enfoque no es producto nuevo de elucubración judicial, sino derivado de la lógica. En *Cruz Costales v. E.L.A.,* supra, mientras estaba en una clase de carpintería —y el maestro fuera del salón de clases— un estudiante resultó herido cuando un individuo entró, cogió un machete, dijo que era "medio loco" y lesionó al estudiante que estaba allí al lado. Éste se dispuso a coger un metro cercano y, al ver eso, el intruso lo cortó con el machete. Aunque reconocimos que la presencia del intruso fue una causa interventora-imprevisible y extraordinaria, impusimos responsabilidad al Estado. Señalamos:

> Esa circunstancia dentro de otro cuadro de hechos seguramente hubiese relevado de culpa al demandado pero creemos que la causa legal del daño fue la ausencia, que nunca fue explicada, del maestro del salón de clases porque si el maestro hubiese estado presente es muy probable que hubiese podido evitar el acto torticero ya que, en primer lugar, la presencia de un maestro varón en el salón de clases posiblemente hubiese intimidado al intruso y éste no hubiese cortado al menor; además, como el intruso estuvo por unos minutos amenazando a los estudiantes durante ese tiempo el maestro, con su madurez superior a la de los niños, probablemente hubiese bregado con la situación en tal forma que se hubiese evitado la lesión. Por lo menos el maestro no hubiese permitido que el menor lesionado se acercase al intruso amenazante. *Cruz Costales v. E.L.A.,* supra, págs. 113–114.

De igual forma podemos concluir en el caso ante nos, máxime tratándose de un cuerpo semipolicial, con miembros debidamente uniformados,[5] lo que, de ordinario, genera que el ciudadano común identifique una figura de autoridad y respeto, afectando su conducta por temor a la sanción o a las medidas disciplinarias de quien representa esa autoridad.

Por los fundamentos expuestos, *se dictará sentencia para revocar la desestimación decretada contra el Estado Libre Asociado. Se devolverán al Tribunal Superior los au-*

---

[5] Así lo provee el Art. 9 de la Ley Núm. 26, *supra,* 18 L.P.R.A. sec. 141g.

*tos originales para procedimientos ulteriores compatibles con lo aquí resuelto.*

El Juez Asociado Señor Fuster Berlingeri emitió una opinión de conformidad. El Juez Asociado Señor Hernández Denton emitió una opinión disidente, a la cual se unieron la Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Corrada Del Río.

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri.

Una de la nociones más prevaleciente entre los estudiosos de la criminología es que poco vale fijar penas severas a los delitos graves, como medio para *evitar* la comisión de crímenes, si tales penas no constituyen una *amenaza real* de castigo para el malhechor. Para una gran parte de los delincuentes, el efecto disuasivo de la justicia criminal depende primordialmente de que estos crean que si cometen un delito *serán apresados y convictos por ello prontamente.* Como bien han señalado dos eruditos de la sociología jurídica, "it is almost trite to say that it is not the *severity* but the *certainty* of punishment that deters". L. Friedman y S. Macaulay, *Law and the Behavioral Sciences*, Indianapolis, Bobbs-Merrill Co. Inc., 1977, pág. 297. Véase, además, R. Clark, *Crime in America*, Nueva York, Ed. Simon Schuster, 1970, págs. 331; 117–119.

En Puerto Rico, muchos de los crímenes que se cometen comúnmente ocurren porque los delincuentes, al realizarlos, se sentían seguros de que no serían aprehendidos. En el fundamental estudio realizado hace ya varios años, *Etiología de la violencia en Puerto Rico*, se destaca como uno de los hallazgos principales que "a medida que aumenta la probabilidad de arrestos, se reduce la criminalidad .... El delincuente es temeroso del riesgo [de ser aprehendido]

...".(¹) Y, claro está, cuando no existe vigilancia alguna en el lugar donde acontecen los delitos, y por ende ninguna posibilidad de arresto, los delincuentes saben que pueden realizar sus fechorías impunemente.

Lo señalado en los párrafos anteriores es muy pertinente a la controversia ante nos en este caso. La ausencia de vigilancia policíaca en los alrededores de los planteles escolares ha dado lugar en el pasado reciente a que éstos constituyan un foco atractivo para la criminalidad. Conocido es que las escuelas públicas en Puerto Rico se han convertido en los últimos años en presa fácil para ciertos tipos de delincuentes que merodean por sus alrededores porque son conscientes de que nadie les va a impedir cometer sus actos vandálicos y otras felonías. En un estudio realizado por la División de Investigaciones e Innovaciones Educativas del entonces Departamento de Instrucción Pública se ha destacado que el problema del vandalismo escolar recrudece precisamente cuando no hay vigilancia policíaca que disuada a los delincuentes de cometer sus fechorías.(²)

El problema de la criminalidad en los planteles escolares hizo crisis en los años 1982–1983 y dio lugar por espacio de muchos meses a un extenso debate público sobre qué debía hacerse para atajar la grave ola de violencia que venía afectando a la instrucción pública. Se organizaron diversos grupos de estudio; se discutieron abiertamente dife-

---

(¹) *Etiología de la violencia en Puerto Rico*, Río Piedras, Technical Services of Puerto Rico, Inc., [s.a.], Vol. II, págs. 32–33.

(²) En el informe conjunto de las Comisiones de Instrucción y Cultura, y de lo Jurídico Penal de la Cámara de Representantes, en torno al proyecto que dio lugar a la referida ley, se hace referencia a El Estudio sobre Vandalismo Escolar en las Escuelas Públicas de Puerto Rico Durante el Año Escolar 1982-83, realizado por la División de Investigaciones e Innovaciones Educativas del Departamento de Instrucción Pública. Conforme dicho estudio, el vandalismo escolar se recrudece durante los fines de semana, los días feriados y en tiempo fuera del horario escolar, *cuando no hay vigilancia ninguna*. También se señala en el estudio que la incidencia de ese vandalismo disminuye en la medida que aumenta la participación o colaboración de los padres de estudiantes en las escuelas.

rentes planes de acción, todo ello como parte del esfuerzo colectivo por encarar este ominoso mal social.(³)

En 1985 se aprobó la Ley del Cuerpo de Seguridad Escolar. En su exposición de motivos se indicó lo siguiente:

> Uno de los sectores que se ha visto afectado por la alta incidencia criminal son las escuelas públicas. Desde hace ya algún tiempo se ha puesto de manifiesto que el vandalismo en los planteles escolares así como la comisión de todo tipo de delitos ha sido un problema que han tenido que afrontar las escuelas de Puerto Rico. Exposición de Motivos de la Ley Núm. 26 de 5 de junio de 1985, Leyes de Puerto Rico 89.

El propósito de la ley fue precisamente dotar a las escuelas de un *organismo visible de vigilancia* que propendiese de ese modo a la prevención de actos delictivos dentro y en los alrededores de los planteles escolares. Se informaba esta ley en la medular noción antes mencionada de que para proteger a las escuelas públicas era necesario fomentar disuasivos eficaces contra los delincuentes, quienes se habían acostumbrado a realizar sus fechorías en dichas escuelas impunemente.

La experiencia habida desde entonces con el Cuerpo de Seguridad Escolar, aunque limitada, demuestra claramente que la noción medular que informó la creación de dicho cuerpo es válida. En efecto, en un informe del Departamento de Educación sobre el particular se resalta que, según los datos estadísticos correspondientes, ha ocurrido

---

(³) Para una muestra de la intensidad y frecuencia del debate público sobre el vandalismo escolar, véanse las correspondientes noticias y editoriales sobre el particular publicados en los siguientes periódicos, en las fechas indicadas: *El Mundo*, 27 de noviembre de 1981; 25 de enero de 1982; 18 de marzo de 1982; 4 de abril de 1982; 27 de marzo de 1982; 6 de noviembre de 1982; 4 de febrero de 1983; 3 de abril de 1983; 2 de mayo de 1983; 10 de mayo de 1983; 11 de mayo de 1983; *El Nuevo Día*, 25 de enero de 1982; 19 de marzo de 1982; 21 de marzo de 1982; 16 de julio de 1982; 9 de noviembre de 1982; 25 de febrero de 1983; 10 de mayo de 1983; 11 de mayo de 1983; *El Vocero*, 26 de enero de 1982; 20 de marzo de 1982; 15 de junio de 1982; 18 de octubre de 1982; 11 de mayo de 1983.

"una considerable reducción de delitos en las escuelas atendidas por los guardias escolares".[4]

Por la dinámica conocida de la criminalidad en Puerto Rico, incluso la que acontece en zonas escolares, pues, la presencia notoria de un cuerpo de seguridad escolar se configura como un disuasivo eficaz contra la delincuencia que allí ha acontecido de ordinario por la ausencia de vigilancia. No sólo por especulación lógica, sino, además, a base de experiencias comprobadas, un incidente como el del caso ante nos, en toda probabilidad no hubiese ocurrido de haber existido un cuerpo de seguridad en la escuela en cuestión. El grupito de jóvenes que asaltaron al estudiante agredido en el caso de autos difícilmente se hubiera atrevido a realizar dicha agresión, de saber que la escuela estaba protegida por el cuerpo aludido.

En tales circunstancias, sociológicamente verificables, el Estado es responsable por la golpiza sufrida por el estudiante. La alarmante omisión de no haber implantado a tiempo un mecanismo ordenado por ley precisamente para evitar incidentes como los de este caso, sobre todo en vista del trágico y patentemente conocido historial de violencia en las escuelas públicas y sus alrededores, constituyó un acto de negligencia, al cual puede razonablemente imputársele el incidente en cuestión. Le correspondía a la alta dirección escolar acatar la ley y usar los recursos dis-

---

[4] Informe Preliminar de Logros 1990–91, Área de Planificación y Desarrollo Educativo, abril 1991.

Aunque la ley que creó el referido cuerpo de seguridad escolar le impone al Secretario de Educación la obligación de evaluar los logros y alcances de ésta y rendir los informes correspondientes al Gobernador y a la Asamblea Legislativa , 18 L.P.R.A. sec. 141*l*, no parecen existir los referidos informes en relación a los años 1985–1989; y lo que aparece respecto a los años 1990–1995 es de muy poco contenido. Así se desprende de una certificación al respecto emitida por la Comisionada del Cuerpo de Seguridad Escolar el 6 de diciembre de 1995. Aparentemente, ello se debe a que el programa de seguridad escolar en cuestión ha venido desarrollándose gradualmente, y ello sólo en los distritos escolares considerados como de alto riesgo.

Aun así, los informes recientes reflejan una significativa reducción en la actividad delictiva en aquellas escuelas en las que sí se ha implantado el programa. Véase el Informe del Año Escolar 1993–1994, Oficina de Seguridad Escolar, junio 1994.

poníbles para hacerla valer, y así cumplir a fondo con el *deber urgente* —que tenían encomendado— de proteger a los estudiantes.

Por lo anterior, que justifica de una manera muy particular el resultado a que llega la mayoría en su opinión, así como su exposición doctrinal, voto conforme.

—O—

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se unen la Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Corrada Del Río.

El problema de la criminalidad es uno de los mayores y más angustiosos males que aquejan a la sociedad puertorriqueña. Esta amenaza social ha llegado también a nuestras escuelas públicas y sus áreas aledañas. Con el propósito de ofrecer "la más eficaz protección y seguridad de estudiantes, profesores y personal no docente y las facilidades físicas escolares" (Exposición de Motivos de la Ley Núm. 26 de 5 de junio de 1985, Leyes de Puerto Rico, pág. 90), la Asamblea Legislativa aprobó la Ley Núm. 26 de 5 de junio de 1985 (en adelante Ley Núm. 26), 18 L.P.R.A. sec. 141 *et seq.*,([1]) que creó el Cuerpo de Seguridad Escolar.

Aunque esta legislación tuvo el propósito de concederle facultad al Departamento de Educación para organizar un cuerpo que prestara vigilancia en las escuelas públicas del país, la legislación no tuvo ni la intención ni el efecto de imponerle al Estado la obligación de tener una guardia escolar en todos los planteles ni de asumir responsabilidad

---

([1]) "... or cuanto, se ha venido experimentando en nuestra Isla un continuo aumento en la criminalidad y en los sucesos de violencia y de vandalismo que han ocurrido en los planteles escolares recientemente, se hace por tanto urgente y necesario crear un cuerpo de orden público bajo la dirección del Secretario de Instrucción Pública para la más eficaz protección de la seguridad de los estudiantes, maestros, personal no docente así como de las facilidades físicas escolares." 18 L.P.R.A. sec. 141.

por todos los actos delictivos ocurridos dentro y fuera de las escuelas. Por considerar que la opinión mayoritaria interpreta equivocadamente el propósito y el alcance de la Ley del Cuerpo de Seguridad Escolar y por fíat judicial le impone al Departamento de Educación la onerosa obligación de asignar guardias escolares en todas las escuelas del sistema de instrucción pública y de garantizar la seguridad de todos los estudiantes, disentimos. Además, consideramos que en el caso de autos no se probó la alegada negligencia del Departamento de Educación en su gestión de proteger la seguridad de los estudiantes.

No existe controversia material en cuanto a los hechos. El 30 de noviembre de 1989 el estudiante Nathaniel Tormos Mercado salió de la Escuela William D. Boyce para almorzar en su casa, acompañado de su hermano, su novia y del hermano de ésta. Salieron por el portón de atrás, abierto en ese período para que los estudiantes vayan a almorzar, y el cual colinda con una calle de residencias privadas que forma parte de la urbanización Las Lomas. La residencia de Tormos Mercado quedaba a sólo un (1) bloque de la escuela.

Cuando regresaban por la misma calle y se acercaban al portón, se les aproximó un grupo de cinco (5) a seis (6) jóvenes. Los acompañantes de Nathaniel apresuraron el paso pues presentían que algo iba a pasar y entraron a la escuela sin detenerse. Nathaniel, sin embargo, fue rodeado por el grupo y uno de los jóvenes lo agredió con los puños. El incidente ocurrió alrededor de la 1:00 P.M., hora de entrada luego del período de almuerzo y aconteció tan rápido que ni Nathaniel ni sus acompañantes lograron identificar a ninguno de los jóvenes agresores.

Los padres de Nathaniel, por sí y en representación del menor, presentaron una demanda en daños y perjuicios contra el Departamento de Educación por los daños sufridos como resultado de la agresión. El tribunal de instancia desestimó la demanda contra el Estado Libre Asociado (en

adelante E.L.A.) por entender que no hubo incumplimiento del deber de cuidado ni se probó la relación causal entre la falta de un cuerpo de seguridad escolar y lo ocurrido al estudiante Nathaniel Tormos Mercado.

Luego de examinar el cuadro fáctico descrito, la mayoría de este Tribunal opta por revocar la sentencia de instancia. Según la opinión mayoritaria, en la Exposición de Motivos de la Ley Núm. 26, *supra*, el legislador reconoció la crítica situación de criminalidad y vandalismo que aqueja a los planteles escolares y sus alrededores y que, por lo tanto, era previsible y pudo evitarse el incidente de la agresión de haber existido en la escuela un consejo de seguridad operando apropiadamente. Añade que, en este caso, "estamos ante un deber de previsibilidad general a priori que hizo la Asamblea Legislativa consciente de la probabilidad de actos delictivos en planteles escolares y sus alrededores; resultado de una realidad reiterada y persistente". Opinión mayoritaria, pág. 278. La opinión concluye que la presencia de un cuerpo cuasipolicial en el plantel hubiera cambiado la situación, no sólo por la posibilidad de una pronta y oportuna intervención, sino como factor disuasivo dimanante del conocimiento de la ciudadanía de su existencia.

## III

Nunca antes nos hemos enfrentado a un caso en el que se pretende responsabilizar a una institución educativa por actos intencionales de un tercero extraño efectuados contra un estudiante fuera de los predios escolares. Al imponerle responsabilidad al Departamento de Educación del E.L.A. en el caso de autos, la mayoría de este Tribunal parece apoyarse esencialmente en dos (2) fundamentos. El primero es que el Departamento de Educación incumplió el deber impuesto por la Ley Núm. 26, *supra*, de crear y mantener activo un consejo de seguridad con funciones cuasipoliciales en la escuela William D. Boyce y cuyos deberes

se extienden hasta doscientos (200) metros fuera de los predios del plantel. Según la opinión, el alegado incumplimiento de la ley por parte de la parte demandada constituyó la causa adecuada del daño sufrido por Tormos Mercado.

El segundo fundamento se encuentra en las "admisiones" de la Directora del plantel, por ser indicativas de que la agresión era previsible y pudo haberse evitado con su oportuna intervención. La opinión acoge el planteamiento de los demandantes de que independientemente de la existencia o no de un comité de seguridad, la Directora debió hacer algo ante la presencia de extraños en las afueras del plantel. Alegato de la parte recurrente, pág. 13.

Entendemos que la sentencia revocatoria de este Tribunal no sólo se basa en una interpretación equivocada de la Ley Núm. 26, *supra*, sino que además impone una norma de previsibilidad cuyo efecto práctico es convertir a las escuelas públicas del país en aseguradores de la seguridad de sus estudiantes fuera del plantel escolar dentro de un radio de doscientos (200) metros.

Para que el E.L.A. responda por la omisión de no proveer adecuada seguridad en una escuela pública, al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, es necesario que se cumplan dos (2) requisitos: (1) la existencia de un deber jurídico de actuar, cuyo incumplimiento constituye la antijuridicidad, y (2) que de haberse realizado el acto omitido se hubiera evitado el daño. *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94 (1986). Entendemos que el primer requisito no se cumple en el caso de autos. Veamos.

*A. El deber impuesto por la Ley Núm. 26, supra, como fuente de responsabilidad.*

La opinión mayoritaria parte de la premisa de que la Ley Núm. 26, *supra*, impone la obligación de crear y mantener un cuerpo de seguridad escolar con funciones cuasi-

policiales en *todas* las escuelas públicas del país. Recurso de revisión, pág. 7; Opinión mayoritaria, págs. 270–271. Esta interpretación estatutaria resulta excesivamente amplia y se aleja de la verdadera intención legislativa que dio vida a la Ley Núm. 26, *supra*. Una lectura cabal del estatuto demuestra que el legislador no tuvo la intención de que el aludido Cuerpo de Seguridad Escolar operara en todos los planteles del sistema de instrucción pública de Puerto Rico. Si bien es cierto que la Ley Núm. 26, *supra*, reconoce el interés de proteger a las comunidades escolares ante el aumento en la criminalidad y el vandalismo en nuestro país, del mismo texto surge que el Cuerpo de Seguridad Escolar opera con limitados recursos,[2] y con prioridad en aquellos planteles que hayan mostrado *un alto grado de criminalidad y vandalismo*.

La ley establece que "[e]l Secretario tomará las medidas necesarias para que los miembros del Cuerpo sean asignados *en primer lugar a aquellos planteles escolares y sus alrededores en los cuales se ha venido demostrando un alto grado de vandalismo e incidencia criminal*". (Énfasis suplido.) 18 L.P.R.A. sec. 141c. En cuanto a la creación del sistema de seguridad, se aclara en la ley que "*se concederá prioridad* al asignar los servicios del Cuerpo a aquellos planteles escolares con mayores problemas de vandalismo e incidencia criminal". (Énfasis suplido.) 18 L.P.R.A. sec. 141d.

Las disposiciones de la Ley Núm. 26, *supra*, anteriormente citadas revelan que la intención legislativa no fue la de imponer el alegado *deber* de operar un cuerpo policial en *todas* las escuelas públicas del país. Al reconocerle prioridad a aquellos planteles con alto grado de vandalismo e incidencia criminal, el legislador reconoce implícitamente que habrá planteles en los cuales no se establecerá el

---

[2] La ley ordena una limitada asignación de fondos, quinientos mil dólares ($500,000) para comenzar el programa en el año 1985–1986, sujeto a asignaciones en años subsiguientes. Art. 15 de la Ley Núm. 26 de 5 de junio de 1985, Leyes de Puerto Rico, pág. 96.

cuerpo de seguridad. De otro modo no se hubiese hecho la distinción en términos de prioridades. Ante la carencia de recursos gubernamentales disponibles para operar el programa en todas las escuelas, ésta es la única interpretación aceptable del estatuto que crea el Cuerpo de Seguridad Escolar. Sin embargo, la mayoría de esta Curia ignora estos aspectos de la ley, dando por sentado que existía un deber de operar dicho cuerpo de seguridad en la Escuela William D. Boyce, independientemente de las particulares circunstancias y necesidades de dicho plantel.

En el caso de autos no hubo alegación específica ni desfiló prueba alguna de que la Escuela William D. Boyce estuviera en una situación de *alto grado de incidencia criminal o vandalismo* que exigiese la creación del cuerpo en dicho plantel. Los demandantes se conformaron con alegar, en forma general, la incidencia criminal que afecta a todo el país e incidentalmente a las escuelas públicas. Dicha alegación no es suficiente para imponerle responsabilidad al E.L.A. en el caso de autos. A esos efectos debe recordarse la norma general reiterada en nuestra jurisprudencia de que no existe responsabilidad civil por la "criminalidad general que exista en el ambiente de la sociedad en que la persona se desenvuelve, y que una entidad o institución no es un asegurador de la seguridad de las personas con las que se relaciona o la patrocinan". *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294, 320 (1990). Como hemos señalado, la Ley Núm. 26, *supra*, no tuvo el efecto de modificar la mencionada norma en el caso de las escuelas públicas del país. A la luz de la prueba disponible debe concluirse que la Ley Núm. 26, *supra*, no imponía la *obligación* al E.L.A. de mantener en la Escuela William D. Boyce un cuerpo de seguridad escolar.

Debemos aclarar también el alcance de la responsabilidad del plantel en cuanto a la demarcación de los doscientos (200) metros, que según la ley cubre los "alrededores" de la escuela. Dicha demarcación no tiene el efecto de res-

ponsabilizar al Estado por todos los actos delictivos que terceros lleven a cabo en esa área (fuera del plantel). La "zona" de doscientos (200) metros establece únicamente el límite hasta donde se extienden los deberes y las facultades del cuerpo en aquellos planteles en los que opere el Cuerpo de Seguridad Escolar.

Otra interpretación resulta contraria a la intención del legislador. La norma resulta tan gravosa que su efecto práctico es el de imponer responsabilidad absoluta, no sólo por las agresiones que acontezcan dentro del plantel, sino también por las que ocurran dentro de un radio de doscientos (200) metros fuera de éste. Por lo anteriormente expuesto, la conclusión a que llega la mayoría de este Tribunal es jurídicamente insostenible.

## B. El deber de cuidado de las instituciones educativas

En ausencia de un deber especial impuesto por la Ley Núm. 26, *supra*, en el caso de autos el E.L.A. sólo respondería si se puede establecer que incumplió el deber de cuidado impuesto a las instituciones educativas públicas por la normativa jurisprudencial. Anteriormente hemos tenido la oportunidad de expresarnos ampliamente sobre la obligación de proveer seguridad impuesta por nuestro ordenamiento a las instituciones educativas. En el caso de *Elba A.B.M. v. U.P.R.*, supra, examinamos la extensión de dicha responsabilidad en el contexto de daños sufridos por una estudiante universitaria debido a la conducta criminal intencional (una violación), perpetrada dentro de las facilidades de una institución educativa, por un tercero extraño que no era ni estudiante ni empleado de la institución. Íd.

En *Elba A.B.M. v. U.P.R.*, supra, expresamos que en casos de crímenes violentos cometidos por extraños dentro de los predios de las instituciones educativas la responsabilidad de la institución no es absoluta. Íd., pág. 314. Asimismo aclaramos que "[e]l grado de seguridad que viene

obligada a ofrecer una institución educativa depende de *la naturaleza de la institución, de su localización y la manera en que funciona y ofrece sus servicios*". (Énfasis suplido.) Íd. Para que se responsabilice a la institución, la parte demandante debe probar que dicha institución incumplió su deber de proveer adecuada seguridad a sus estudiantes, que ese incumplimiento fue la causa adecuada del daño causado por el acto intencional de un tercero y que el daño era previsible. Íd., págs. 320–321.

Al aplicar la citada norma a los hechos particulares según alegados y probados en el caso de *Elba A.B.M. v. U.P.R.*, supra, este Tribunal concluyó que la Universidad de Puerto Rico (en adelante U.P.R.) era responsable por los daños sufridos por la estudiante víctima de una violación dentro del Recinto de Río Piedras. Alguno de los hechos particulares, sustentados por la prueba, que hacían previsible la agresión sexual en el caso de *Elba A.B.M.*, supra, fueron los siguientes: (*a*) El Recinto de Río Piedras es el principal y más grande de los que componen el sistema universitario de la U.P.R.; (*b*) Este Recinto posee una alta concentración de estudiantes, en su mayoría mujeres; (*c*) dicho recinto estaba localizado en un área de alta incidencia criminal; (*d*) las autoridades universitarias conocían, no sólo de la ocurrencia de hechos delictivos anteriores, en específico de agresiones sexuales, sino también cuáles eran aquellas áreas que por sus circunstancias particulares se podían considerar de alto riesgo; (*e*) que la violación ocurrió de noche en un área donde había falta de alumbrado, arbustos sin podar, una frondosa y espesa vegetación y edificios solitarios, y (*f*) la administración omitió su deber de adoptar las medidas para sustituir dos (2) guardias que se ausentaron y que esa noche debían prestar vigilancia en el lugar de los hechos. De las circunstancias que rodearon la violación en el caso de *Elba A.B.M., supra*, resultaba razonablemente previsible el hecho de la agresión sexual y por

lo tanto concluimos que la violación fue causada porque la U.P.R. no cumplió con su deber de proveer seguridad adecuada a los miembros de la comunidad universitaria.

En el caso de autos no están ni remotamente presentes circunstancias similares a las que en *Elba A.B.M. v. U.P.R.*, supra, justificaron la imposición de responsabilidad a la U.P.R. La agresión sufrida por el joven Tormos Mercado no fue consecuencia de un incumplimiento del deber de cuidado por parte de los encargados de la escuela. En este caso la agresión ocurre durante la hora de almuerzo en que recesan las operaciones escolares, a plena luz del día y en un área fuera del plantel escolar. Tampoco desfiló prueba de que la administración de la escuela tenía conocimiento de que el área del incidente fuera una de alto riesgo de incidencia criminal. Finalmente, el incidente ocurrió con suma rapidez como admite la propia parte demandante. Ante esos hechos no puede concluirse razonablemente que la agresión se debió a que la Directora y demás personal administrativo escolar incumplieran con su deber de vigilancia y seguridad en el plantel.

De otro lado, las "admisiones" de la Directora Escolar no tienen el efecto de imponer una obligación especial de evitar cualquier daño que un tercero pueda causar a los estudiantes tanto dentro como fuera del plantel. No es sostenible el argumento de que la Directora debió haber intervenido con unos extraños que vio en las afueras de la escuela antes de que ocurriera la agresión. Como declaró la Directora, era usual ver extraños transcurriendo por esa calle, ya que la escuela es parte de una vecindad. No era razonable anticipar que la mera presencia de un grupo de personas deambulando por una carretera aledaña a la escuela iba a culminar en la agresión de uno de sus estudiantes. Bajo la teoría de la mayoría, los directores y el personal docente de las escuelas del país tendrían la obligación de intervenir con todas las personas que transiten o permanezcan en las calles colindantes a los planteles, o de

llamar a la policía en cada caso ante la posibilidad de que ocurra una agresión. La alta incidencia criminal en nuestro país no tiene el efecto de imponer a las escuelas un deber de cuidado que los convierta en aseguradores de la seguridad de los estudiantes. *Elba A.B.M. v. U.P.R.*, supra. A la luz de los hechos, no existía un deber jurídico de actuar.

Debe quedar claro que, en principio, estamos de acuerdo con una política pública dirigida a la protección de nuestros estudiantes. Sin embargo, entendemos que no le corresponde a este Tribunal crear, por fíat judicial, una responsabilidad civil que no impone la ley. El deber de crear un cuerpo de seguridad escolar es una prerrogativa de la Rama Legislativa y el alcance de dicho deber, según se desprende de la Ley Núm. 26, *supra*, no es el que interpreta la mayoría.

Según la norma impuesta en el presente caso, el Departamento de Educación tendrá que crear un cuerpo policial independiente de la policía estatal con personal suficiente para que opere en todas las escuelas del país. A esos fines, se deberán asignar miles de miembros para que presten adecuada vigilancia en los mil quinientos sesenta y ocho (1,568) planteles que componen el sistema de escuelas públicas del país.[3] Debe recordarse que según la mayoría, no basta con que presten vigilancia dentro de los planteles, sino que también han de cubrir los doscientos (200) metros del área circundante para garantizar la seguridad de cerca de *seiscientos veintisiete mil (627,000)* estudiantes que actualmente asisten a las escuelas del Departamento de Educación.[4] Además, deberá crearse toda una nueva je-

---

[3] Número de escuelas correspondiente al año 1995–1996. División de Investigación y Estadísticas del Departamento de Educación del Estado Libre Asociado (E.L.A.). Presumiendo que un modesto promedio de tres (3) agentes por plantel será suficiente, el número total de cadetes para el adecuado funcionamiento del cuerpo sería de cuatro mil setecientos cuatro (4,704).

[4] Matrícula en las escuelas públicas diurnas para el comienzo del año 1995-1996. División de Investigación y Estadísticas del Departamento de Educación del Estado Libre Asociado.

rarquía policial y la correspondiente burocracia administrativa.

En síntesis, la exégesis equivocada de la mayoría no sólo es jurídicamente insostenible, sino que también supone una reasignación de los limitados recursos del Estado que le corresponde formular al legislador.

Por todo lo anterior, disentimos. Contrario a la opinión mayoritaria, confirmaríamos la sentencia del Tribunal de Primera Instancia.