JOSÉ E. ORTIZ TORRES y OTROS, demandantes y recurridos, *v.* K. & A. DEVELOPERS, INC. y OTROS, demandados y peticionarios.

*Número:* CE-90-604          *Resuelto:* 25 de mayo de 1994

*Jorge E. Pérez Díaz*, Procurador General, *Norma Cotti Cruz*, Subprocuradora General, *Laura Ydrach Vivoni*, Procuradora General Auxiliar, abogados de El Pueblo; *José A. Cuevas Segarra*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Cuestiona el Estado Libre Asociado de Puerto Rico la responsabilidad bajo el Art. 1802 del Código Civil, 31

L.P.R.A. sec. 5141, fundamentada en conceder permisos para la construcción de las urbanizaciones Alturas de San Lorenzo y Jardines de Cerro Gordo,[1] sin cerciorarse que se tomaran medidas para lidiar con posibles inundaciones de la quebrada "Los Puercos" y no dar mantenimiento al puente cuya obstrucción provocó la inundación.[2]

I

La quebrada "Los Puercos" se origina en el tope de la montaña en la colindancia de los Municipios de San Lorenzo con Juncos a 3.5 kilómetros del sector afectado. Su cuenca hidrográfica es de aproximadamente mil ochocientos setenta y ocho (1,878) acres, con una pendiente promedio de siete por ciento (7%). Sus ramificaciones se han unido hasta formar un solo cuerpo al pasar por la colindancia oeste de las referidas urbanizaciones; cruza el desvío de la Carr. Estatal Núm. 183 y desemboca en el Río Grande de Loíza.

Antes de construirse las secciones de las urbanizaciones afectadas, en 1972, el sector se inundó cuando la quebrada se salió de su cauce. La inundación se debió a que el sistema de desagüe de la Carr. Estatal Núm. 183 era inadecuado, pues consistía de un solo tubo para el paso del agua proveniente de la quebrada. Dicho problema fue corregido al ser sustituido por dos (2) tubos corrugados de trece (13) pies de diámetro, con capacidad de discurrir los aguaceros de recurrencia durante cien (100) años. *Desde la instalación de estos tubos el área no sufrió más inundaciones hasta las ocurridas el 27 de noviembre de 1987.*

*Con posterioridad a la instalación de esos tubos*, el 3 de marzo de 1976 la Junta de Planificación autorizó urbani-

---

[1] La Administración de Reglamentos y Permisos (A.R.Pe.) y la Junta de Planificación son las agencias gubernamentales encargadas de concederlos.

[2] Los demandantes José E. Ortiz Torres *et al.* sostuvieron que el mantenimiento del puente era función del Departamento de Recursos Naturales.

zar el sector y, cuando aún el área no había sido oficialmente clasificada como inundable en los Mapas de Zonas Susceptibles de Inundaciones, le impuso *al desarrollador el adoptar medidas para controlar inundaciones.* El 30 de diciembre de 1976 A.R.Pᴇ. aprobó el plano de construcción de la primera sección de la Urb. Alturas de San Lorenzo. El 13 de marzo de 1979 el Departamento de Recursos Naturales *requirió* que se designara para uso público una franja *de 7.5 metros* de ancho a lo largo de la colindancia con la quebrada "Los Puercos" como medida de seguridad, y se cumplieran las especificaciones del Reglamento Núm. 13 de la Junta de Planificación de 30 de diciembre de 1971. Se cumplió con el requisito de la franja de terreno. En 1980 *se incluyó el sector de la quebrada* "Los Puercos" en los Mapas de Zonas Susceptibles de Inundaciones como Zona Núm. 2.[3] El 13 de mayo de 1981 A.R.Pᴇ. autorizó la construcción de la *segunda sección* de la Urb. Alturas de San Lorenzo. Estas casas se entregaron a sus compradores entre diciembre de 1981 y agosto de 1982. En 1982 se *reclasificó* el área de la quebrada como Zona 1. En 1988, *pasadas las inundaciones,* se incluyó parte de las urbanizaciones afectadas como Zona 2.

Desde el 24 de noviembre hasta el 9 de diciembre de 1987 Puerto Rico se vio afectado por intensas y fuertes lluvias. Tomamos conocimiento judicial en cuanto a que éstas provocaron que veintidós (22) pueblos de la isla, entre ellos San Lorenzo, fueran declarados zona de desastre por el Presidente de Estados Unidos. El área de San Lo-

---

[3] Las áreas susceptibles a inundaciones se clasifican, de acuerdo con el Reglamento Núm. 13 de la Junta de Planificación de 30 de diciembre de 1971, tomando en consideración los límites alcanzados por la avenida máxima histórica o avenida extraordinaria o las marejadas y los niveles alcanzados o que puedan alcanzar las aguas como consecuencia de dichas avenidas o marejadas; la intensidad de peligro a que estén expuestas la vida y hacienda de las personas establecidas o que puedan establecerse en éstas, y elementos tales como la profundidad y velocidad de las aguas y la condición de forraje del terreno y grado de saturación del mismo.

En lugares clasificados como Zona 1 no se permite la ubicación de nuevas edificaciones, y en la Zona 2 sólo la construcción cuyo diseño resista los efectos de las aguas de inundación.

renzo sufrió aguaceros de intensidad de 1.28 pulgadas mínima a 4.20 pulgadas máxima, en períodos de veinticuatro (24) horas desde el 24 al 26 de noviembre. En la madrugada del 27 de noviembre la lluvia se intensificó considerablemente. Se registraron lluvias de 12.5 pulgadas durante un período de veinticuatro (24) horas en ese día. Desde aproximadamente las 3:00 A.M., la quebrada se salió de su cauce inundando durante varias horas las residencias de los demandantes Ortiz Torres *et al.* (entre cuatro (4) y siete (7) pies), quienes se vieron precisados a abandonarlas.

Como era natural, desde el 27 de noviembre hasta el 7 de diciembre, el Municipio de San Lorenzo y los residentes demandantes se dedicaron a limpiar las urbanizaciones y sus calles, y a habilitar sus hogares.

Durante ese período, la quebrada "Los Puercos" y los dos (2) tubos corrugados que pasan bajo la Carretera Estatal Núm. 183 no recibieron el mantenimiento adecuado, permaneciendo los tubos tapados con basura, árboles y matojos. En este intervalo la lluvia mermó en aguaceros ligeros hasta el 7 de diciembre cuando en un período de veinticuatro (24) horas cayeron 11.60 pulgadas de lluvia que, nuevamente, produjeron inundaciones con magnitud semejante a las ocurridas el 27 de noviembre.

Por ambas inundaciones Ortiz Torres *et al.* demandaron a las constructoras K. & A. Developers, Masso y Contreras, al Municipio de San Lorenzo, al Estado Libre Asociado, a la Autoridad de Acueductos y Alcantarillados, a A.R.Pe., a la Junta de Planificación, al Sr. Rafael Vázquez y su sociedad de gananciales, y a sus respectivas aseguradoras.[4] Todos negaron responsabilidad. Durante el juicio declaró el pe-

---

[4] Los demandantes desistieron de las demandas incoadas contra Rafael Vázquez y su sociedad de gananciales, así como la instada contra K. & A. Developers, según una notificación de 15 de marzo de 1989.

Las demandas contra Masso y Contreras, y la Autoridad de Acueductos y Alcantarillados se desestimaron el 13 de marzo de 1990. La instada contra el Municipio de San Lorenzo se desestimó el 29 de mayo de 1990.

rito Ing. Fernando A. Oliver Padilla por los demandantes y el Ing. Ismael Pagán Trinidad como perito del Estado. Las determinaciones cruciales de hecho del Tribunal Superior, Sala de Caguas (Hon. Julio Berríos Jiménez, Juez) descansan primordialmente en esas declaraciones. Dictó sentencia parcial contra el Estado, concluyendo que la Junta de Planificación y A.R.Pe. fueron negligentes al autorizar la construcción de las urbanizaciones Alturas de San Lorenzo y Jardines de Cerro Gordo sin que se adoptaran medidas para el control de inundaciones; impuso también responsabilidad al Departamento de Recursos Naturales por no brindar mantenimiento al puente, a la quebrada y a los tubos corrugados. A solicitud del Estado, revisamos.(5)

## II

De entrada, debemos establecer cuál fue la causa próxima de los daños sufridos por los demandantes Ortiz Flores *et al.* Es de conocimiento que una acción de daños al amparo del Art. 1802 del Código Civil, *supra*, requiere, primero, la producción de un daño; segundo, un acto u omisión culposo o negligente y, tercero, la existencia de un nexo causal entre el daño y la acción u omisión de otra persona. *Torres Maldonado v. J.C. Penney Co.*, 130 D.P.R. 546 (1992); *Arroyo López v. E.L.A.*, 126 D.P.R. 682 (1990); *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94, 106 (1986).

La prueba presentada demuestra que con posterioridad

---

(5) Nos plantea y discute los señalamientos siguientes:

"1. Cometió error de derecho el Honorable Tribunal de instancia al hacer determinaciones de hecho y conclusiones de derecho que no están sostenidas por la prueba presentada al concluir que la primera inundación, la ocurrida el día 27 de noviembre de 1987, así como la segunda inundación ocurrida 10 días después de ésta, se debieron a la falta de mantenimiento por parte del Estado a la quebrada Los Puercos, al puente que la cruza y a los tubos corrugados bajo el mismo; y al haberse concedido permisos de construcción en un área susceptible de inundaciones.

"2. Cometió error de derecho el Honorable Tribunal de instancia al concluir que el Departamento de Recursos Naturales tiene la obligación de dar mantenimiento a la quebrada Los Puercos." Petición de *certiorari*, pág. 4.

a la inundación de 1972 —mucho antes de la construcción de los sectores afectados de las urbanizaciones que motivan la presente acción— dos (2) tubos corrugados fueron instalados para controlar la inundabilidad del área de la quebrada. Desde entonces, durante quince (15) años no se produjo ninguna inundación hasta la de 27 de noviembre de 1987. Los peritos coincidieron —y las partes así lo reconocen— que las lluvias de 27 de noviembre y de 7 de diciembre *no excedieron la capacidad de los tubos de trece (13) pies de diámetro instalados para el flujo de las aguas de la quebrada.* Por lo tanto, es ineludible concluir que la causa próxima de las inundaciones fue su obstrucción. Ello provocó el desbordamiento del cauce y la inundación de las residencias.

■ Al respecto hemos expresado:

"...[E]l deber de indemnizar requiere la existencia de un nexo causal entre el daño y el acto u omisión culposo o negligente. *El hecho de que no se cumpla con alguna ley, reglamento o norma establecida no es motivo para que se tenga que responder civilmente por un daño,* a menos que exista relación causal entre dicha violación y el daño causado. *Pacheco v. A.F.F.,* 112 D.P.R. 296, 302 (1982). En materia de relación causal nos regimos por la teoría de la causalidad adecuada, conforme la cual no es causa toda condición sin la cual no se hubiese producido el resultado, sino aquella que ordinariamente lo produce según la experiencia general. *Jiménez v. Pelegrina,* 112 D.P.R. 700 (1982)." (Énfasis suplido.) *Arroyo López v. E.L.A.,* supra, págs. 689–690. Véase, además, *Torres Maldonado v. J.C. Penney Co.,* supra.

Aclarado que la causa que provocó las inundaciones fue la obstrucción de los tubos corrugados, el hecho de que la Junta de Planificación y A.R.Pe. hubiesen otorgado los permisos,[6] no genera responsabilidad por no haber causalidad adecuada con la inundación. Evidencia de esto es el

---

[6] La aprobación significa que el plano cumple con los requisitos mínimos que exige la ley y la reglamentación. *Rivera v. Caribbean Home Const. Corp.,* 100 D.P.R. 106, 114 (1971); *Santaella Negrón v. Licari,* 83 D.P.R. 887, 898 (1961).

dato —no contradicho— de que el sector no había sufrido inundaciones desde que se instaló el segundo tubo corrugado; si hubiesen ocurrido independientemente de que los tubos estuvieran obstruidos, entonces la causalidad con el otorgamiento de los permisos hubiese sido un factor determinante.

## III

Réstanos determinar si el Estado incurrió en negligencia debido a la obstrucción. No hay controversia en que la capacidad de los tubos era suficiente para controlar la cantidad de agua producto de las lluvias; recuérdese que la inundación fue causada por la obstrucción. Las partes coinciden en que la lluvia caída era previsible para dicho sector, por lo que no estamos ante un caso de fuerza mayor o caso fortuito. *Rivera v. Caribbean Home Const. Corp.*, 100 D.P.R. 106, 118–119 (1971). El Estado reconoció esta previsibilidad atribuyéndole ser el motivo por el cual se instaló el segundo tubo. También las partes aceptan que la obstrucción fue en la boca de los tubos y que se debió a la acumulación de escombros, tales como árboles, yerbajos, alambres y otros. Esta acumulación se delió a un muro de cinco (5) pies de espesor que los separaba. Sin embargo el Estado sostiene que no era previsible que el aguacero del 27 de noviembre trajese *arrastres de otros lugares* de tal magnitud que obstruyeran los referidos tubos de drenaje ocasionando el consabido envase de aguas.

Ciertamente no se desfiló prueba que demostrara que, con anterioridad a la madrugada de 27 de noviembre, los tubos estuviesen obstruidos. Nótese que la intensidad del agua discurrió normalmente hasta ese momento. Tampoco hay evidencia de que antes de esa fecha hubiese en la quebrada desperdicios o escombros. No surge del récord que se le notificara o comunicara al Estado —ni por el municipio o persona particular— que el puente o la quebrada reque-

rían limpieza con anterioridad al 27 de noviembre. La obligación de presentar esa evidencia recaía principalmente sobre los demandantes Ortiz Torres *et al. Reece Corp. v. Ariela, Inc.*, 122 D.P.R. 270, 286 (1988). En términos probatorios, no podemos presumir que los tubos estaban tapados o que la quebrada se encontraba falta de conservación o mantenimiento; si acaso, las Reglas 16(15) y (32) de Evidencia, 32 L.P.R.A. Ap. IV, nos llevan a presumir lo contrario.[7] *Srio. del Trabajo v. Hull Dobbs Co.*, 107 D.P.R. 441, 446 (1978).

■ Que el Estado estipulara que la quebrada no había recibido mantenimiento con anterioridad a las inundaciones no implica que en ésta hubiese escombros; estaríamos especulando si llegaramos a esa conclusión.[8]

Lo único que la prueba refleja es que antes de esas inundaciones un vecino del sector taló una finca aledaña a la quebrada, cuyos árboles y yerbajos fueron a parar a su lecho. Al intensificarse sustancialmente las lluvias, estos escombros fueron arrastrados hasta los tubos bajo el puente, contribuyendo a la obstrucción. Así se desprende del informe del Ing. Fernando A. Oliver, perito de los demandantes Ortiz Torres *et al.*, y la ponencia ante la Comisión de Vivienda del Senado presentada por William Gó-

---

[7] La regla dispone:

"Las presunciones son aquellas establecidas por ley o por decisiones judiciales. Entre las presunciones controvertibles se encuentran las siguientes.

.    .    .    .    .    .    .    . .

"(15) Que los deberes de un cargo han sido cumplidos con regularidad.

.    .    .    .    .    .    .    .

"(32) Que la ley ha sido acatada." 32 L.P.R.A. Ap. IV, R. 16(15) y (32).

[8] "La negligencia debe establecerse por prueba o por inferencia de los hechos establecidos. ... Al considerar la evidencia circunstancial aducida para probar un hecho, el juzgador debe reconocer la distinción existente entre aquella que es una mera conjetura y la que es una inferencia razonable.

"El requisito de que el demandante pruebe hechos de los cuales se pueda razonablemente inferir la negligencia del demandado, no quiere decir que deba eliminarse toda posibilidad de causas distintas de la que se alega. Debe establecerse, sin embargo, que la posibilidad de tales otras causas queda tan reducida que la mayor posibilidad es que la negligencia del demandado fue la causa próxima del accidente." *Vda. de Delgado v. Boston Ins. Co.*, 99 D.P.R. 714, 724 (1971).

mez, Alcalde del Municipio de San Lorenzo para esa época. Se estimó que dicha finca pertenecía a Rafael Vázquez, a quien los demandantes incluyeron como demandado en la acción original pero que después solicitaron el desistimiento. Regla 39.1(a) de Procedimiento Civil, 32 L.P.R.A. Ap. III. Ello tiende a demostrar que desde el principio los demandantes Ortiz Torres *et al.* conocían unos actos específicos de una tercera persona que contribuyó a la obstrucción de los tubos, que fue la causa de la inundación. Sin embargo, los demandantes Ortiz Torres *et al.* optaron por desistir de ese reclamo y continuar únicamente contra las instrumentalidades gubernamentales.

El Departamento de Recursos Naturales tiene como función velar por que no se depositen desperdicios, escombros y rellenos en los cauces mayores de ríos y quebradas, en virtud de la Sec. 13.01 del Reglamento Núm. 13 sobre Zonas Susceptibles a Inundaciones, 2da rev., de 6 de marzo de 1987.[9] Aun así, no podemos convertir al Estado en un garantizador absoluto del bienestar público, al extremo de tener que velar constantemente, como en este caso, por los actos de terceras personas que puedan provocar inundaciones. Requerirle al Estado mantener limpios en todo momento de escombros y basura —depositados por terceras personas en fincas aledañas— no sólo en la quebrada "Los Puercos" sino en todos los ríos y quebradas de Puerto Rico y terrenos colindantes resulta no sólo irrazonable, sino imposible. Las limitaciones económicas y humanas del Estado impiden semejante curso decisorio.

En resumen, no hay prueba que demuestre la condición de los tubos y de la quebrada antes de la inundación de 27 de noviembre. Habida cuenta de que el agua discurrió normalmente por éstos durante varios días, y de que hubo prueba de que la obstrucción de los tubos se debió a los

---

[9] El reglamento que regía al momento del otorgamiento de permisos de construcción era el aprobado el 30 de diciembre de 1971, según enmendado en 1978.

El vigente cuando ocurrieron las inundaciones era la segunda revisión adoptada el 6 de marzo de 1987.

actos de terceras personas, sin pasar juicio sobre la responsabilidad jurídica de éstas, no podemos imponer responsabilidad al Estado por la inundación de 27 de noviembre.

## IV

La segunda inundación ocurrida el 7 de diciembre se debió a que el Estado no limpió los tubos corrugados con posterioridad a la inundación de 27 de noviembre. El aguacero de intensidad de 11.60 pulgadas de lluvia en un período de veinticuatro (24) horas, unido al efecto acumulativo de las lluvias de los días anteriores, provocaron la segunda inundación. Aún así, la prueba demuestra que la cantidad de agua no excedió a la capacidad de los tubos.

La controversia consiste en determinar si el intervalo de diez (10) días entre ambos eventos era suficiente para que el Estado limpiara los escombros que formaron la represa el 27 de noviembre.

El Estado aduce que ello resulta irrazonable debido a que sus recursos de personal y equipo para brindar mantenimiento inmediato se encontraban laborando en otros lugares.

*No tiene razón.* Durante el juicio, el Estado alegó haberlos limpiado entre una inundación y otra; al demostrarse que no lo hizo sostiene ahora que fue debido a falta de recursos y de tiempo. La dificultad del argumento es que el Estado no presentó prueba sobre el particular en el tribunal de instancia; no procede a nivel apelativo. *Autoridad Sobre Hogares v. Sagastivelza*, 71 D.P.R. 436, 439 (1950).

Ausente esa prueba, no podemos concluir que el término de diez (10) días entre las inundaciones no era suficiente para atender el problema. Existió un estado de emergencia y se comunicó a las autoridades[10] la necesidad de que se

---

[10] La prueba presentada demostró que el entonces alcalde de San Lorenzo notificó verbalmente a Fortaleza y al Comité de Emergencia del Distrito de Humacao el 28 de noviembre de 1987. Posteriormente hizo un informe formal escrito.

limpiara el puente. El Estado no demostró que se encontraba imposibilitado de hacerlo con posterioridad a la primera inundación; su inacción genera responsabilidad y responde por los daños ocurridos a consecuencia de la segunda inundación.

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Rebollo López y el Juez Asociado Señor Alonso Alonso no intervinieron.