Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| **JOSÉ RAMÓN MORALES FLORES** como candidato que no fue electo por el voto directo, pero que obtuvo más votos en el partido que llegó segundo en la votación para Legislador Municipal en Comerío<br><br>**Apelante**<br><br>v.<br><br>COMISIÓN ESTATAL DE ELECCIONES A TRAVÉS DE SU PRESIDENTA ALTERNA, HON. JESSIKA PADILLA RIVERA;<br><br>LCDO. ANÍBAL VEGA BORGES como Comisionado del Partido Nuevo Progresista<br><br>LCDA. KARLA ANGLERÓ GONZÁLEZ como Comisionada del Partido Popular Democrático;<br><br>ROBERTO IVÁN APONTE BERRÍOS como Comisionado del Partido Independentista Puertorriqueño;<br><br>LILLIAM APONTE DONES como Comisionada del Movimiento Victoria Ciudadana;<br><br>LCDO. JUAN FRONTERA SUAU como Comisionado del Proyecto Dignidad;<br><br>SRA. JANNETTE VILA SANTOS como candidata a la Legislatura Municipal de Comerío<br><br>**Apelados** | KLAN202500137<br><br><br><br><br><br>consolidado con | Apelación procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso núm.: SJ2025CV00122 (904)<br><br>Sobre: Código Electoral y otros |
| JOSÉ RAMÓN MORALES FLORES como candidato que no fue electo por el voto directo, pero que obtuvo más votos en el | KLAN202500140 | |

partido que llegó segundo en la votación para Legislador Municipal en Comerío

**Apelado**

v.

COMISIÓN ESTATAL DE ELECCIONES A TRAVÉS DE SU PRESIDENTA ALTERNA, HON. JESSIKA PADILLA RIVERA;

**LCDO. ANÍBAL VEGA BORGES como Comisionado del Partido Nuevo Progresista**

**Apelante**

LCDA. KARLA ANGLERÓ GONZÁLEZ como Comisionada del Partido Popular Democrático;

ROBERTO IVÁN APONTE BERRÍOS como Comisionado del Partido Independentista Puertorriqueño;

LILLIAM APONTE DONES como Comisionada del Movimiento Victoria Ciudadana;

LCDO. JUAN FRONTERA SUAU como Comisionado del Proyecto Dignidad;

SRA. JANNETTE VILA SANTOS como candidata a la Legislatura Municipal de Comerío

**Apelados**

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Rodríguez Flores.

Sánchez Ramos, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de marzo de 2025.

El Tribunal de Primera Instancia (TPI), por las alegaciones, denegó una impugnación a una determinación de la Comisión

Estatal de Elecciones (la "Comisión" o la "CEE") mediante la cual se certificó a un candidato del Partido Nuevo Progresista ("P1"), un candidato del Partido Popular Democrático ("P2") y otro del Partido Independentista Puertorriqueño ("P3") como los integrantes 10 a 12 de la legislatura municipal del Municipio de Comerío (la "Asamblea"). Según se explica a continuación, concluimos que actuó correctamente el TPI, pues cinco de los nueve otros candidatos que fueron elegidos directamente mediante el voto de los electores pertenecen al P1, por lo cual la aplicación literal de lo dispuesto en la ley aplicable (certificar a dos candidatos adicionales del P2) conllevaría un resultado absurdo, pues se invertiría el resultado pretendido por los votantes.

I.

El 8 de enero de 2025, el Sr. José Ramón Morales Flores (el "Demandante" o "C12") presentó ante el TPI la acción de referencia, sobre *Mandamus,* Sentencia Declaratoria, *Injunction* Preliminar y Permanente (la "Demanda"), en contra de la CEE, el Sr. Aníbal Vega Borges, como Comisionado Electoral del P1 ("CE del P1"), la Sa. Karla M. Angleró González, como Comisionada Electoral del P2, el Sr. Roberto I. Aponte Berríos, Comisionado Electoral del P3, el Sr. Juan M. Frontera Suau, Comisionado Electoral del Proyecto Dignidad y la Sa. Jannette Vila Santos, quien fue certificada por la Comisión como integrante de la Asamblea por el P1 ("C10").

El Demandante solicitó que el TPI le ordenara a la CEE emitir su certificado de elección como integrante de la Asamblea. Explicó que la Asamblea se compone de doce (12) miembros, de conformidad con el Artículo 1.020 de la Ley 107-2020 (el "Código Municipal"), 21 LPRA sec. 7041. Reseñó que los primeros nueve (9) integrantes de la Asamblea serán los que más votos obtengan (cada elector puede votar por un máximo de nueve candidato(a)s).

Sin embargo, subrayó que el Código Municipal dispone que los restantes tres (3) escaños (los "Tres Legisladores Adicionales") "se elegirán de entre los candidatos de los dos partidos principales contrarios al que pertenece la mayoría de los Legisladores Municipales electos mediante el voto directo". Art. 1.022 del Código Municipal, 21 LPRA sec. 7043. **En efecto, el referido estatuto dispone que la CEE "declarará electo, entre los candidatos que no hayan sido electos por el voto directo, aquellos dos (2) que hayan recibido más votos en el partido que llegó segundo en la votación… y uno del partido que llegó tercero**". Íd (énfasis suplido).

El Demandante aseveró que, de los nueve candidatos escogidos por voto directo (los "Nueve Legisladores Electos"), cinco son del P1 y cuatro del P2. La posición 10 la ocupó C10, la posición 11 la ocupó un candidato del P2 (C11), y la posición 12 la ocupó el Demandante. Por tanto, los doce candidatos que más votos obtuvieron están divididos por igual entre el P1 y el P2.

De conformidad con una Certificación (la "Decisión") de la Comisión, también con fecha 8 de enero de 2025, se certificaron como los Tres Legisladores Adicionales a: C10 (afiliado al P1), C11 (afiliado al P2) y a la Sa. Yaxinailiz Ayala Alicea, afiliada al P3 ("C19"). Como resultado de la Decisión, la Asamblea está compuesta por seis personas afiliadas al P1, cinco al P2 y una al P3.

En orden de votos obtenidos, los resultados de la elección fueron los siguientes:

| Posición | Partido | Nombre | Votos |
|---|---|---|---|
| 1 | PNP | Christian Alicea Cabrera | 3,327 |
| 2 | PPD | Belkis Yamitza Díaz Hevia | 3,298 |
| 3 | PPD | Juan B. Padilla Cosme | 3,265 |
| 4 | PPD | Mary Carmen Rodríguez Alejandro | 3,261 |
| 5 | PNP | Jorge Alicea Santos | 3,250 |
| 6 | PNP | Paulanicole Ortiz Gorritz | 3,241 |
| 7 | PNP | Zamary Ojeda Avilés | 3,237 |
| 8 | PNP | Luz H. (Aidita) Morales | 3,237 |

| 9 | PPD | Carmen N. Alvarado Malavé | 3,236 |
|---|---|---|---|
| 10 | PNP | Jannette Vila | 3,235 |
| 11 | PPD | José A. Rodríguez Otero | 3,226 |
| 12 | PPD | José Ramón Morales Flores | 3,220 |
| 13 | PNP | Janice Rodríguez | 3,218 |
| 14 | PNP | Raúl Joel Falcón Ayala | 3,215 |
| 15 | PPD | Raúl Figueroa Berríos | 3,213 |
| 16 | PPD | María Milagros Ramírez Santos | 3,208 |
| 17 | PPD | Rafael A. García Acosta | 3,204 |
| 18 | PNP | Brendali Escribano | 3,181 |
| 19 | PIP | Yaxinailiz Ayala Alicea | 426 |
| 20 | PIP | Valeria Colón López | 424 |
| 21 | PIP | Juan Carlos Bermúdez Ayala | 409 |
| 22 | PIP | Iris Dianne Falcón Cabrera | 402 |
| 23 | PIP | Carlos Colón Márquez | 396 |
| 24 | PIP | Rubén Ortiz Cruz | 392 |
| 25 | PIP | Virgilio Valentín Ruiz | 386 |
| 26 | PIP | Karol S. Ramírez Delgado | 374 |
| 27 | PIP | Helda Liz Alicea Feliciano | 374 |
| 28 | MVC | Cristian González | 197 |
| 29 | MVC | Iliana Agosto Ayala | 156 |
| 30 | MVC | Raziel Figueroa Figueroa | 128 |
| 31 | MVC | Brendaly Rivera Malavé | 120 |
| 32 | MVC | Kevin Nieves Rodríguez | 106 |
| 33 | PD | Daniel Hiraldo Delbrey | 103 |
| 34 | MVC | Sergio Yahveh Santiago Sánchez | 101 |
| 35 | MVC | Naisha Nicole López Cancel | 99 |

El Demandante planteó que, de conformidad con lo dispuesto en el Código, la Comisión debió certificar, como los Tres Legisladores Adicionales, a dos candidatos del P2 (C11 y él) y a C19 (del P3), en vez de certificar a C10 (del P1), C11 (del P2) y C19 (del P3). Para hacer referencia a la Decisión, el Demandante presentó una *Demanda Enmendada* mediante la cual impugnó la certificación de C10 bajo el Artículo 10.15 del Código Electoral, 16 LPRA sec. 4765.

La CEE presentó su postura ante el TPI; arguyó que la aplicación literal del Código Municipal provocaría un resultado absurdo, pues se cambiaría el resultado de la elección, al generarse una mayoría del P2 en la Asamblea (6-5-1), a pesar de que P1 obtuvo una mayoría de 5-4 entre los Nueve Legisladores Electos. Sostuvo que la disposición estatutaria sobre los Tres Legisladores Adicionales lo que pretende es fortalecer la representación de las minorías en la Asamblea, no convertir a la minoría en mayoría. En

6

apoyo, la CEE citó, de modo persuasivo, la decisión de este Tribunal en *Cruz v. CEE* (KLAN20050075 cons. con KLAN20050082).

En atención a lo anterior, la CEE sostuvo la corrección de la Decisión, mediante la cual se asignó un solo escaño al P2, uno al P3 y uno al P1, de manera que se no se alterara la mayoría de un voto obtenida por P1 entre los Nueve Legisladores Electos. La Comisión planteó que así se mantenía el equilibrio de los intereses en juego, de forma que coexista la voluntad del elector con una representación adecuada de los partidos de minoría.

El 21 de enero, C10 interpuso una *Contestación A Demanda Enmendada y Demanda Contra Tercero*. En la *Demanda Contra Terceros* acumuló como terceros demandados a todos los integrantes de la Asamblea y al Sr. Heriberto Fernández López, quien se alegó era el secretario de la Asamblea (el "Secretario"). Se relataron varios incidentes ocurridos en la sesión inaugural de dicho cuerpo legislativo, incluido el hecho de que había quedado empate la votación para elegir a un nuevo presidente de la Asamblea. Se solicitó que el TPI dictara una sentencia declaratoria que le reconociera a los integrantes de la Asamblea afiliados al P1 "elegir un presidente" y a los efectos de establecer que "el puesto de secretario … ha quedado vacante", y que "un nuevo secretario debe ser designado" por los integrantes de la Asamblea afiliados al P1.

**En la Demanda contra Terceros, C10 no impugnó la determinación de la Comisión en cuanto a la composición de la Asamblea.** Por su parte, el CE del P1, al contestar la Demanda, **tampoco impugnó la determinación de la CEE en cuanto a la composición de la Asamblea.**

Mientras tanto, en réplica a lo planteado por la CEE, el Demandante arguyó que no se podía soslayar el texto claro del Código Municipal, por lo que debía aplicarse de forma literal.

Además, informó que, en elecciones pasadas, la CEE había aplicado la disposición estatutaria en controversia de forma inconsistente.

Mediante una Sentencia notificada el 10 de febrero (la "Sentencia"), el TPI declaró sin lugar la Demanda; también se denegó la Demanda Contra Terceros instada por C10[1]. El TPI concluyó que, en casos en donde la aplicación literal del Art. 1.022 del Código Municipal menoscabe la mayoría obtenida por un partido político mediante el voto directo de los electores en las elecciones legislativas municipales, la CEE debe distribuir los Tres Legisladores Adicionales entre los partidos, incluido quien tiene la mayoría, a los fines de preservar esa mayoría, por el margen mínimo de un legislador. Por tanto, declaró válida la Decisión.

Inconforme, el 19 de febrero, el Demandante presentó uno de los recursos que nos ocupan (KLAN202500137); formula los siguientes señalamientos de error:

> 1. Erró el Tribunal de Primera Instancia al determinar que la Presidenta Alterna de la CEE, la Hon. Jessika Padilla Rivera tenía discreción para seleccionar los tres miembros adicionales —no electos mediante voto directo— para la legislatura municipal de Comerio.

> 2. Erró el Tribunal de Primera Instancia al declarar No Ha Lugar la impugnación de la elección de la señora Vila Santos, siendo la certificación de esta contraria a las disposiciones del Código Municipal de Puerto Rico.

Por su parte, el 20 de febrero, el CE del P1 interpuso el otro recurso de apelación que nos ocupa (KLAN202500140); plantea que el TPI cometió el siguiente error:

> Erró el Tribunal de Primera Instancia al validar la interpretación del a presidenta Alterna de la CEE; quien determinó que el Artículo 1.022 del Código Municipal le facultaba adjudicar un (1) sólo legislador municipal adicional al partido nuevo progresista, en lugar de dos (2) provocando un empate artificial que distorsionó la voluntad del electorado, perpetuando así una administración ultra vires en la legislatura municipal de Comerio y alterando ilegítimamente la composición legislativa mayoritaria del partido político que recibió mayor respaldo en las urnas.

---

[1] Ninguna de las partes apeló de la determinación del TPI de denegar la Demanda Contra Terceros instada por C10.

En esencia, el CE del P1, a través de su recurso, sostiene que, en realidad, la CEE debió certificar a dos candidatos del P1, y a una del P3, como los Tres Legisladores Adicionales. Ello con el fin de evitar el "empate artificial" que se generó al combinar los cinco integrantes del P2 con la integrante del P3, en comparación con los seis integrantes del P1.[2]

El 24 de febrero, ordenamos la consolidación de los dos recursos. Con el beneficio de los escritos de las partes concernidas, resolvemos.

II.

El mecanismo de sentencia declaratoria provisto por la Regla 59 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 59, permite al tribunal emitir un dictamen cuando los hechos alegados demuestran que existe una controversia sustancial entre partes que tienen intereses legales adversos, sin que medie lesión previa de los mismos, ello con el propósito de disipar la incertidumbre jurídica y contribuir a la paz social. R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 5ta ed., San Juan, Ed. Lexis Nexis, 2010, pág. 560. Su fin es proveer al ciudadano un mecanismo procesal de carácter remedial mediante el cual pueda anticiparse a dilucidar ante los tribunales los méritos de cualquier reclamación que pueda representar un peligro potencial en su contra. J. Cuevas Segarra, *Tratado de Derecho Procesal*, 2da ed., Publicaciones JTS, 2011, Tomo V, pág. 1788.

El empleo de la sentencia declaratoria está limitado. La controversia no debe ser abstracta, teórica, remota, académica o

---

[2] Ciertos integrantes de la Asamblea, terceros demandados, presentaron un escrito mediante el cual anunciaron que se unían al recurso presentado por el CE del P1. Igual lo hizo C10. No obstante, estos dos escritos son inoficiosos, pues la reglamentación de este Tribunal no contempla que una parte pueda presentar una apelación mediante una moción "uniéndose" a otra apelación. Para apelar la Sentencia, estas partes tenían que haber presentado o suscrito un escrito de apelación formal dentro del término jurisdiccional aplicable.

especulativa. *Moscoso v. Rivera,* 76 DPR 481, 492-493 (1954). Debe ser actual y el daño que se pueda ocasionar no debe ser demasiado especulativo. *Íd.* El peso de la prueba de que existe una controversia real a ser adjudicada es del peticionario. Cuevas Segarra, *op. cit.*, pág. 1796. La controversia debe establecer una comparación entre determinados intereses públicos y sociales que puedan quedar afectados, y los intereses privados de las partes. *Íd.* Su necesidad debe tener raíces en la realidad.

Para que una demanda de sentencia declaratoria sea justiciable, es necesario que exista "una controversia sustancial entre partes que tengan intereses legales adversos, de suficiente inmediación, madurez y realidad para que hagan aconsejable el remedio declaratorio". *Moscoso v. Rivera,* 76 DPR a la pág. 492, citando a *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941).

En fin, la sentencia declaratoria es un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra el promovente. *Suárez v. C.E.E. I,* 163 DPR 347, 354 (2004); *Charana v. Pueblo,* 109 DPR 641, 653-654 (1980). Constituye el medio adecuado para que los tribunales ejerzan su función de interpretar las leyes, declarando el estado de derecho vigente. *Sánchez et al. v. Srio. De Justicia et al.*, 157 DPR 360, 383-384 (2002).

### III.

El derecho al voto es fundamental y uno de los más preciados para los ciudadanos en los sistemas democráticos, por ser esencialmente pilar de la democracia. Véase, *Ramírez de Ferrer v. Mari Brás,* 144 DPR 141, 173 (1997) citando a *P.P.D. v. Admor. Gen. de Elecciones,* 111 DPR 199, 207 (1981), *Granados v. Rodríguez Estrada I,* 124 DPR 1, 6 (1989).

A tales efectos, el Artículo II, Sección 2, de la Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho al sufragio universal. Const. de P.R., Art. II, Sec. 2, 1 LPRA. Esta garantía constitucional contempla que las leyes deben garantizar la expresión de la voluntad del pueblo, mediante el sufragio universal, igual, directo y secreto, y proteger al ciudadano contra toda coacción en el ejercicio de dicha prerrogativa electoral. Por tratarse de un derecho fundamental, es obligación de los tribunales hacerlo observar y respetar. *Guadalupe v. C.E.E.*, 165 DPR 106, 117 (2005); *P.P.D. v. Admor. Gen. De Elecciones*, 111 DPR a la pág. 221.

Ahora bien, el derecho constitucional al voto no es absoluto y la Asamblea Legislativa posee la facultad para reglamentar el proceso electoral. *P.A.C. v. P.I.P.*, 169 DPR 775, 794 (2010); *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 DPR 1, 30 (1988); P.A.C. v. E.L.A. I, 150 DPR 359, 372 (2000). Así se desprende de nuestra Constitución, la cual establece que "[s]e dispondrá por ley todo lo concerniente al proceso electoral y de la inscripción de electores, así como lo relativo a los partidos políticos y candidaturas". Const. de P.R., Art. VI, Sec. 4, 1 LPRA. De conformidad, "los partidos políticos, las candidaturas de los aspirantes a puestos políticos y los derechos de los electores están obligados por la legislación que, a esos efectos, promulgue la Asamblea Legislativa". *Rivera et al. v. Torres et al.*, 214 DPR ___ (2024); 2024 TSPR 60, a la pág. 27.

La Ley 58-2020, conocida como Código Electoral de Puerto Rico de 2020, 16 LPRA sec. 4501, *et seq.* (el "Código Electoral"), entre otras disposiciones, perpetúa la existencia de la CEE, creada por la derogada Ley Electoral de 1977.[3] La CEE tiene la responsabilidad "de planificar, organizar, dirigir y supervisar el organismo electoral y los procedimientos de naturaleza electoral que, conforme esta Ley,

---

[3] Ley Núm. 4-1977, 16 LPRA sec. 3001 *et seq.*

y a leyes federales aplicables, rijan en cualquier Votación a realizarse en Puerto Rico". Art. 3.2 del Código Electoral, 16 LPRA sec. 4512. Para poder desempeñar dicha responsabilidad, la CEE "tendrá, además y entre otras funciones, que cumplir y hacer cumplir las disposiciones y los propósitos del Código Electoral de 2020". *Rivera et al.*, 2024 TSPR 60, a las págs. 27-28. Por su parte, el Presidente de la CEE tendrá, entre otras, la facultad de "[r]ealizar todos aquellos otros actos necesarios y convenientes para el cumplimiento de esta Ley". Art. 3.8 del Código Electoral, 16 LPRA sec. 4518(18).

Por otro lado, "la premisa básica de nuestro ordenamiento constitucional es que la mayoría gobierna mediante sus representantes electos tanto en la Rama Ejecutiva como en la Rama Legislativa". *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 75 (2009). Sin embargo, el Artículo III, Sec. 7 de nuestra Constitución,[4] incorporó, por medio de la llamada "Ley de Minorías", un mecanismo innovador para garantizar la representación efectiva de las delegaciones minoritarias en la Legislatura. *Íd.*

Presumiblemente inspirada por ello, la Asamblea Legislativa, de conformidad con su autoridad bajo el Artículo VI, Sec. 1 de la Constitución del Estado Libre Asociado,[5] diseñó un esquema dirigido a garantizar la representación de minorías en las asambleas legislativas municipales. En lo que aquí nos concierne, el Artículo 1.022 del Código Municipal establece lo siguiente:

> Artículo 1.022 — Elección de la Legislatura Municipal
> Los miembros de las Legislaturas Municipales serán electos por el voto directo de los electores del municipio a que corresponda en cada elección general, por un término de cuatro (4) años, contados a partir del segundo lunes de enero del año siguiente a la elección general en que son electos y ejercerán las funciones de

---

[4] Art. III, Sec. 7(b), Const. E.L.A., 1 LPRA.

[5] La Asamblea Legislativa tendrá facultad para crear, suprimir, consolidar, y reorganizar municipios, modificar sus límites territoriales y *determinar lo relativo a su régimen y función*; y podrá autorizarlos, además, a desarrollar programas de bienestar y a crear aquellos organismos que fueren necesarios a tal fin.

sus cargos hasta el segundo lunes del mes de enero posterior a la elección general.

Los partidos políticos sólo podrán postular trece (13), once (11) y nueve (9) candidatos a las Legislaturas Municipales compuestas de dieciséis (16), catorce (14) y doce (12) miembros respectivamente; disponiéndose, que para la Ciudad Capital de San Juan, podrán postular catorce (14) y para Culebra cuatro (4).

La Comisión Estatal de Elecciones declarará electos entre todos los candidatos, a los trece (13), once (11), nueve (9), catorce (14) y cuatro (4) que hayan obtenido la mayor cantidad de votos directos. En caso de que surja un empate para determinar la última posición entre los que serán electos por el voto directo, se utilizará el orden en que aparecen en la papeleta, de arriba hacia abajo, para determinar cuál será electo. **Los tres (3) miembros restantes** de cada una de las Legislaturas Municipales, excepto Culebra que tendrá sólo uno (1) adicional, **se elegirán de entre los candidatos de los dos (2) partidos principales contrarios al que pertenece la mayoría de los Legisladores Municipales electos mediante el voto directo, como sigue:**

**(a) La Comisión Estatal de Elecciones declarará electo, entre los candidatos que no hayan sido electos por el voto directo, aquellos dos (2) que hayan obtenido más votos en el partido que llegó segundo en la votación para Legislador Municipal, y uno (1) del partido que llegó tercero.** En el caso de Culebra, el Legislador Municipal adicional que se declarará electo será del partido segundo en la votación para Legislador Municipal.

(b) En el caso del segundo partido, cuando hubiere más de dos (2) candidatos con la misma o mayor cantidad de votos, se utilizará el orden en que aparecen en la papeleta, en la columna del partido, de arriba hacia abajo, para determinar cuál será electo. Igual disposición aplicará para elegir el candidato de minoría del tercer partido.

(c) Si solamente figuraran dos (2) partidos en la papeleta electoral, los tres (3) miembros restantes se elegirán entre los candidatos que hayan obtenido más votos y que no hayan sido electos por el voto directo en el partido que llegó segundo en la votación para Legislador Municipal.

**La Comisión Estatal de Elecciones adoptará las medidas necesarias para reglamentar las disposiciones contenidas en este Artículo**. (Énfasis provisto).

IV.

De otra parte, la finalidad de la interpretación estatutaria es salvaguardar el propósito que tuvo el legislador al aprobar una ley. *Com. Seguros P.R. v. Gen. Accident Ins. Co.,* 132 DPR 543, 547 (1993); *Srio. D.A.C.O. v. Comunidad San José, Inc.,* 130 DPR 782, a la pág. 797 (1992). Inicialmente, los tribunales debemos

"'remitirnos al propio texto de la ley, puesto que cuando el legislador se ha expresado en un lenguaje claro e inequívoco, [...] es la expresión por excelencia de la intención legislativa". *Gautier Vega v. Comisión Estatal de Elecciones*, 205 DPR 724, 754-755 (2020), (Citas en el original omitidas). "[E]l tribunal no está autorizado a adicionar limitaciones o restricciones que no aparecen en el texto de la ley, ni a suplir omisiones al interpretarla con el pretexto de buscar la intención legislativa". *Íd.*, citando a *Rosado Molina v. ELA y otros*, 195 DPR 581, 589–590 (2016); *Román v. Superintendente de la Policía*, 93 DPR 685, 690 (1966); *Meléndez v. Tribunal Superior*, 90 DPR 656, 662 (1964).

No obstante, una vez determinado que el texto de una disposición legal no es claro, procede que se le dé "la interpretación que mejor responda a los propósitos que persigue". *Gautier Vega*, 205 DPR a la pág. 755, citando a *San Gerónimo Caribe Project v. Registradora*, 189 DPR 849, 868 (2013). La interpretación del texto de una disposición legal "se deberá efectuar de manera conjunta con todas las demás que emanen del mismo cuerpo, sea porque estén comprendidas en éste o porque nazcan y se desprendan de él". *Gautier Vega*, 205 DPR a las págs. 755-756, citando a *Rosado Molina v. ELA y otros, supra*; *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 127 (2012); *Asoc. Fcias. v. Caribe Specialty et al. II*, 179 DPR 923, 939–940 (2010).

De igual modo, se deben armonizar, en la medida posible, todas las disposiciones pertinentes, en aras de obtener un resultado sensato, lógico y razonable. *Rosado Molina v. ELA y otros, supra*. Además, procede examinar e interpretar las disposiciones legales **de modo que no conduzcan a resultados irrazonables o insostenibles, ni a conclusiones absurdas**. *Gautier* Vega, 205 DPR a la pág. 756 citando a *San Gerónimo Caribe Project*, 189 DPR a las págs. 869–870; *Asoc. Fcias.*, 179 DPR a la pág. 940; *Domínguez*

*Castro et al. v. E.L.A. II,* 178 DPR 375, 409 (2010); *Sucn. Alvarez v. Srio. de Justicia,* 150 DPR 252, 276 (2000). Como bien señaló este Tribunal en Cruz, *supra,* "los tribunales estamos compelidos a interpretar las leyes, teniendo presente el propósito social que las inspiró, dándoles un sentido lógico a sus diversas disposiciones y supliendo posibles deficiencias en los casos en que ello sea inevitable."

Asimismo, cuando se trata de la revisión de interpretaciones estatutarias efectuadas por el organismo administrativo facultado por ley para velar por su administración y cumplimiento, los tribunales deben observar el principio de deferencia. *Franco v. Dpto. de Educación,* 148 DPR 703, 709 (1999); *T-JAC, Inc. v. Caguas Centrum Limited,* 148 DPR 70, 80 (1999); *Román v. Superintendente de la Policía,* 93 DPR 685, 690 (1966). En el caso específico de la CEE, el "tribunal debe, en aquellos casos en que la determinación dependa principal o exclusivamente de una cuestión de derecho electoral especializado, guardar la usual deferencia al organismo administrativo". *Mundo Ríos v. CEE,* 187 DPR 200, 207 (2012); *Granados v. Rodríguez Estrada I*, 124 DPR 1, 20 (1989).

Resaltamos que, bajo el título en el Artículo 13.1(2)(a) y (b) del Código Electoral, 16 LPRA, sec. 4841, se dispuso lo siguiente en cuanto a la revisión judicial ante determinaciones de la CEE:

(1). [...]
(2) Obligación de la Rama Judicial
　(a) En todo recurso legal, asunto, caso o controversia que se presente en un Tribunal de Justicia, este deberá dar prioridad a la **deferencia que debe demostrar a las decisiones tomadas por la Comisión a nivel administrativo, siendo esta la institución pública con mayor experti[s]e (sic) en asuntos electorales y la responsable legal de implementar los procesos** que garanticen el derecho fundamental de los electores a ejercer su voto en asuntos de interés público.

　(b) **Ese derecho fundamental a votar del pueblo soberano en nuestro sistema democrático tiene supremacía sobre cualquier otro derecho o interés particular que pretenda impedirle votar**.

Ningún recurso legal, asunto, caso o controversia bajo la jurisdicción interna de la Comisión; y ningún proceso, orden, sentencia o decisión judicial podrán tener el efecto directo o indirecto de impedir, paralizar, interrumpir o posponer la realización de una votación según legislada y según el horario y día específicos dispuestos por ley; a menos que el Tribunal Supremo de Puerto Rico determine la violación de algún derecho civil que, con excepción de una Elección General, posponga la votación o la clasifique como inconstitucional. (Énfasis suplido).

## V.

Concluimos que actuó correctamente el TPI al denegar la impugnación del Demandante a la Decisión. Veamos.

En estas circunstancias particulares, no podemos avalar la aplicación literal y ciega de lo dispuesto en el Código Municipal en cuanto a la elección de los Tres Legisladores Adicionales. De aplicarse de forma literal lo allí dispuesto, una disposición a todas luces diseñada para garantizar cierta participación por las minorías en una legislatura municipal se convertiría en un mecanismo para invertir un resultado electoral, convirtiendo a una minoría en mayoría. En ausencia de evidencia de que este extraño resultado fue específicamente contemplado y deseado por la Asamblea Legislativa, no es viable la teoría del Demandante.

Adviértase que, en este caso, por lo cerrada de la elección de los Nueve Legisladores Electos (5-4), la aplicación literal del Código Electoral llevaría a que P2, que obtuvo solo 4 de los Nueve Legisladores Electos, obtenga una mayoría de 6-5 en comparación con el P1. Es difícil, por no decir imposible, entender por qué la Asamblea Legislativa no pudo prever este escenario y disponer un lenguaje que atendiera la situación de forma adecuada.

En efecto, el mecanismo de elección de los Tres Legisladores Adicionales, según consta en el Artículo 1.022 del Código Municipal, dispone que dos serán del partido que ocupó el segundo lugar en las elecciones y uno (1) para el partido que arribó tercero. En este caso, ello ocasionaría la **alteración de los resultados del voto directo**

**de los electores.** En vista de ello, estamos ante una situación excepcional, en la cual sería absurdo aplicar el texto claro de un estatuto. La interpretación literal del Código Municipal en este caso "conllevaría una burda usurpación del voto". *Cruz, supra.*

Como puntualizáramos previamente, en el ejercicio interpretativo de un estatuto, los tribunales debemos velar celosamente por poner en vigor y hacer efectiva la intención del legislador. En el caso de autos, no podemos concluir que, en estas circunstancias (mayoría de un solo voto entre los Nueve Legisladores Electos), la intención de la Asamblea Legislativa haya sido que se aplique al pie de la letra lo dispuesto en el Artículo 1.022 del Código Municipal, pues ello cambiaría el resultado de la elección, en vez de garantizar o fortalecer la representación de una minoría, como minoría.

Por tanto, ante la difícil situación creada por la falta de previsión de la Asamblea Legislativa, la Comisión actuó razonablemente y válidamente. Aplicó el Artículo 1.022 del Código Municipal a los fines de incorporar representación del P3, así como un candidato adicional del P2, pero certificó a C10 (del P1) como parte de la Asamblea, con el fin de mantener, en la totalidad de la Asamblea, el margen de un voto que P1 obtuvo entre los Nueve Legisladores Adicionales.

Nuestra conclusión se fortalece al considerar que la actuación de la CEE, según acogida por el TPI, es cónsona con la premisa básica de nuestro ordenamiento constitucional de "que la mayoría gobierna mediante sus representantes electos tanto en la Rama Ejecutiva como en la Rama Legislativa". *Suarez Cáceres*, 176 DPR a la pág. 75. En efecto, la Decisión "permitió mantener el equilibrio de los intereses envueltos, de forma que coexistieran la elección del elector, en conjunto con la representación de los demás partidos"; es decir, "el distribuir de forma equilibrada los puestos restantes,

preserva la mayoría obtenida por uno de los partidos, a la vez que mantiene en todo vigor la adecuada presencia y contribución de los partidos restantes." *Cruz, supra.*

Subrayamos, además, que nuestra determinación se ajusta a lo resuelto por este Tribunal en *Cruz, supra,* opinión que hemos encontrado persuasiva. Allí el Tribunal se enfrentó a igual situación, en lo pertinente, bajo la disposición equivalente de la ley anterior a la ahora vigente. Resaltamos el siguiente razonamiento del Tribunal en el citado caso (énfasis en original):

> De permitirse la aplicación fiel y ciega del aludido inciso, el resultado final sería que el partido que adquirió mediante el sufragio una mayoría en la Legislatura, pasaría a ocupar un segundo lugar en contravención al voto que emitieron miles de electores bona fide. ***Para todos los efectos, en este caso el partido de mayoría sería penalizado por precisamente haber logrado dicha posición.*** Ello resulta en una prevaricación inaceptable a los principios de la lógica. Esto además del hecho incuestionable de que el análisis cauteloso de la intención del legislador no reveló que esta fuera la de otorgar la mayoría a un partido que ocupó el segundo lugar en los comicios municipales.

Aunque el Demandante tiene razón al plantear que la Comisión debería haber adoptado reglamentación para asegurar una interpretación razonable y uniforme en circunstancias como esta, la ausencia de reglamentación no podía impedir que la Comisión interpretara la ley y tomara la determinación más razonable ante una situación como la de autos. Así pues, la Decisión se tomó válidamente al amparo de la autoridad y discreción que el propio Artículo 1.022 del Código Municipal, *ante,* le confiere a la CEE para adoptar "las medidas necesarias" para administrar las disposiciones allí contenidas.

Finalmente, también carece de mérito lo planteado por el CE del P1 en su recurso de apelación. Como cuestión de umbral, el recurso es improcedente por la sencilla razón de que, ante el TPI, dicha parte no impugnó la Decisión. Es decir, quien único presentó un recurso de impugnación de la composición de la Asamblea,

según determinada por la CEE, fue el Demandante. Si alguna parte legitimada entendía que debía anularse la certificación de C11, y sustituirse por C13, de manera que P1 contara con 7 integrantes en la Asamblea, el mecanismo era presentar la impugnación correspondiente ante el TPI, no traer el asunto por primera vez ante este Tribunal. La norma bien establecida es que este Tribunal no entrará a evaluar argumentos que pudieron haber sido sometidos ante los foros inferiores, pero no fueron presentados. *Acevedo Sepúlveda v. Depto. Salud*, 191 DPR 28, 33 (2014), citando a *Ortiz Torres v. K & A Developers, Inc.*, 136 DPR 192, 202 (1994).

De todas maneras, en los méritos, es frívolo el planteamiento del CE del P1. Adviértase que lo pretendido por dicha parte es que se utilice un mecanismo diseñado para fortalecer la representación de la minoría para **ampliar** artificialmente la ventaja obtenida por la mayoría. En efecto, lo que se solicita es que, a pesar de que P1 obtuvo solo un voto de mayoría entre los Nueve Legisladores Municipales (5-4), se avale que se integren a la Asamblea siete candidatos del P1, en comparación con solo cuatro del P2 y una del P3 (7-4-1). Ello, además de ir en contra del texto claro del Código Municipal, iría también en contra de su intención y, como si fuera poco, produciría un resultado absurdo. La realidad es que la elección a la Asamblea fue sumamente cerrada, produciéndose una mayoría de un solo voto entre los Nueve Legisladores Electos y, de hecho, entre los 12 candidatos que obtuvieron la mayor cantidad de votos, hubo un empate entre el P1 y el P2.

VI.

Por los fundamentos que anteceden, se confirma la *Sentencia* apelada.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones